613 So.2d 214 (1992)
Darrell CRANE, et al., plaintiff,
v.
EXXON CORPORATION, U.S.A., et al., defendant.
No. 91 CA 1627.
Court of Appeal of Louisiana, First Circuit.
December 23, 1992.
Rehearing Denied January 28, 1993.
*217 Lewis Unglesby, Baton Rouge, for plaintiff-appellee Darrell Crane, et al.
Robert H. Wood, Jr. and Elliott Courtright, New Orleans, for defendant-appellant Exxon Corp., U.S.A.
Michael D. Zelden, Baton Rouge, for Fidelity & Cas. Co. of New York (Intervenor).
Daniel R. Atkinson, Jr., Baton Rouge, for defendant Merit Indus. Constructors, Inc.
Before EDWARDS, SHORTESS and WHIPPLE, JJ.
SHORTESS, Judge.
Darrell Crane (Crane) was injured on January 25, 1988, while working on a construction job at the Exxon plant in East Baton Rouge Parish. He sued his employer, Merit Industrial Constructors, Inc. (Merit), Exxon Corporation[1] (Exxon), and Fred Brauer, Exxon's safety advisor. His wife, Beverly Simeon Crane, his son, Darrell Herman Crane, and his stepson, Jeremy Stewart,[2] joined in the suit seeking damages for loss of consortium. Merit's worker's compensation insurer, The Fidelity and Casualty Company of New York (Fidelity), intervened in the suit to recover the benefits it paid to Crane. Exxon filed a cross-claim against Merit seeking indemnification under the construction contract.
The trial court found Crane's exclusive remedy against Merit was worker's compensation and granted summary judgment in Merit's favor. The plaintiffs voluntarily dismissed Brauer at the beginning of the trial. After trial on the merits against Exxon, the court found Exxon strictly liable for Crain's injuries, assessed fault of 10% to Merit, 10% to Crane, and 80% to Exxon, and dismissed the cross-claim. The court awarded Crane $968,741.51 in general and special damages. The court awarded Beverly Crane $50,000.00 and Darrell Herman Crane $20,000.00 for loss of consortium, but dismissed Jeremy Stewart's loss of consortium claim.[3] Fidelity's intervention was recognized, but its claim was reduced by the negligence attributed to Crane and Merit.
*218 Exxon appealed this judgment contending the trial court erred in finding it strictly liable, in failing to recognize its independent contractor defense and, alternatively, in granting an excessive award and in dismissing the cross-claim. Merit answered Exxon's appeal and asked this court to reverse the trial court's finding that it was 10% at fault.

FACTS
In October 1987 Exxon contracted with Merit for Merit to construct facilities for the installation of a compressor at Exxon's Baton Rouge refinery. The job involved pouring a concrete slab 8 feet to 10 feet high and installing a large compressor atop the slab. According to Dennis Howard, plaintiffs' expert in industrial safety, the surface of the slab was 10 feet by 15 feet. On this slab was a compressor which took up about one-fourth of the slab. A chute with a 12-inch by 18-inch opening was built into the slab to allow electrical conduit to be run to the compressor.
Boyd T. Barrilleaux, Exxon's project engineer who prepared the bid specifications (specs) on this job, testified that at the time the plans and specs were prepared, he did not know whether a hole would exist in the chute area because the conduit might completely fill the hole or the switch gear might cover it. Thus, the design and placement of a grating over the hole was left as a "finishing detail" to be done once the conduit was in place. James H. Stegall, the Exxon project engineer who replaced Barrilleaux on this job in December 1987, testified that whether a hole remained when the job was complete depended on how the conduit was spread. After the conduit was run, Stegall determined a permanent grating was needed; a grating was then designed and installed.
In the meantime, the chute was left open and uncovered, despite Exxon safety regulations made part of the contract with Merit which required that any temporary floor openings be barricaded or covered.[4] The testimony was contradictory regarding whether the opening was covered some time before the accident, but the trial court found "as a matter of credibility, that the chute had not been covered with plywood." It is undisputed that the chute was uncovered on January 25, 1988, when Crane, walking backward while removing a tarp covering the compressor, stepped into the chute and was injured.
The trial court found Exxon strictly liable for Crane's personal injuries because the uncovered chute was "an inherently dangerous defect" which Exxon failed to eliminate by incorporating a temporary grating over the chute in the initial plans. The court further found Exxon "le[ft] safety to chance" by expecting Merit to "cover the temporary opening with plywood as required in the preprinted safety standards issued with [the Exxon] contract."

DID THE TRIAL COURT ERR IN FINDING EXXON STRICTLY LIABLE?
Exxon contends there is no legal basis for the trial court's finding that it was strictly liable. The trial court did not state in its written reasons the codal or jurisprudential basis for its finding of strict liability. The only potential bases for strict liability are Louisiana Civil Code articles 2322 and 2317. Article 2322, which provides for strict liability for the ruin of a building, clearly is inapplicable to this case because it does not impose liability for "ruin" during the construction of a building. Herron v. Lincoln Property Co., 525 So.2d 1189, 1191 (La.App. 5th Cir.1988); Temple v. General Insurance Co., 306 So.2d 915 (La.App. 1st Cir.1974), writ denied, 310 So.2d 643 (La.1975). Thus, we must determine whether Exxon is strictly liable under Civil Code article 2317, which *219 provides, in pertinent part: "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody."
A plaintiff who attempts to impose liability under Civil Code article 2317 on the custodian of a defective thing must prove (1) the thing had a vice or defect; (2) the defect presented an unreasonable risk of harm to others; (3) the thing was in defendant's custody; and (4) damage was caused by the defect. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990); Epps v. Society of The Holy Family, 583 So.2d 1216, 1218 (La.App. 4th Cir.1991); Willis v. Cajun Electric Power Cooperative, 484 So.2d 726, 729 (La.App. 1st Cir.), writ denied, 488 So.2d 200 (La.1986). If a plaintiff fails to prove any one of these facts, his article 2317 claim falls.
The trial court found the chute was a "design and premises hazard." The court apparently relied on the testimony of Crane's expert, Howard. Howard admitted Exxon's safety regulations which were a part of the contract required Merit to cover or barricade all temporary openings. However, he opined that Exxon's design was dangerous because the actual plans (as opposed to the safety regulations) did not provide for a temporary grating to cover the opening.
Crane contends the chute was a defect in the concrete slab which renders Exxon liable under article 2317. A defect for the purposes of article 2317 is a flaw or condition of relative permanence inherent in the thing as one of its qualities. Boudreaux v. Farmer, 604 So.2d 641, 652 n. 10 (La.App. 1st Cir.). writs denied, 605 So.2d 1373 and 605 So.2d 1374 (La.1992); Langley v. Oxford Chemicals, Inc., 559 So.2d 520, 523 (La.App. 2d Cir.1990); Toussant v. Guice, 414 So.2d 850, 852 (La.App. 4th Cir.1982). A temporary condition may constitute a hazard, but it does not constitute a defect as contemplated by article 2317. See Boudreaux, 604 So.2d at 652 n. 10. The open chute in the concrete slab was only a temporary condition; it was designed to be filled with electrical conduit and then covered with permanent grating if any opening remained. This temporary condition does not constitute a defect which would render Exxon liable under article 2317. Thus, we find the trial court committed legal error in finding Exxon strictly liable.

WAS EXXON NEGLIGENT?
Because we have found there was no article 2317 defect, we need not determine whether Exxon had custody of the slab at the time of the accident.[5] We must determine, however, whether Exxon was guilty of negligence, either independently or through Merit, which would render it liable under Civil Code article 2315.

INDEPENDENT CONTRACTOR DEFENSE
Exxon contends it is relieved of all liability for Crane's injury because Merit was acting as an independent contractor. Louisiana law is settled that a principal is not liable for the offenses an independent contractor commits in the course of performing its contractual duties unless (1) the contractor is performing ultra-hazardous work or (2) the principal reserves the right to supervise or control the work. Triplette *220 v. Exxon Corp., 554 So.2d 1361, 1362-1363 (La.App. 1st Cir.1989). Neither party contends the work Merit was performing was ultra-hazardous. The parties strongly dispute, however, whether Exxon reserved the right to supervise or control the work performed by Merit. The trial court made no finding on this issue as it never reached the question of article 2315 liability.
In making the determination of whether a principal retained supervision or control over the contractor, it is the principal's right to exercise control that is of primary concern, not the supervision and control actually exercised. Hickman v. Southern Pacific Transport Co., 262 La. 102, 262 So.2d 385 (1972); Parker v. Boise Southern Co., 570 So.2d 6, 11 (La.App. 3d Cir.1990), writ denied, 575 So.2d 388 (La. 1991); Triplette, 554 So.2d at 1363. In this case, as in Triplette and Parker, the contract required the contractor to comply with the principal's safety standards. However, in Triplette this court stated that "this requirement does not signify the requisite right of operational control sufficient to vitiate the independent contractor relationship. The test for determining owner-independent contractor status is direct supervision over the step-by-step process of accomplishing the work." 554 So.2d at 1363.
The contract between Merit and Exxon required Merit to provide "the necessary labor, supervision, tools, equipment, and materials...." (Emphasis ours) It further provided:
20. Independent Contractor
Contractor in performing Services hereunder shall be an independent contractor and not an agent or employee of Exxon. Contractor's Services hereunder shall meet with the approval of Exxon's engineers or inspectors but the detailed manner and method of doing same shall be under the control of Contractor, Exxon being interested only in the result obtained, and such approvals or inspections shall not change the relationship of the parties, or relieve Contractor of its obligations to perform the Work in a safe, efficient manner.
This provision clearly shows Exxon did not retain the right to directly provide step-by-step supervision.[6] Plaintiffs contend, however, that control was reserved to Exxon by the following contract provision:
10. Compliance with Specifications
Although Contractor shall provide its own representative(s) to supervise and inspect all materials and workmanship in performance of Work hereunder, Exxon reserves the right at anytime (sic), to inspect any part of the Work, the materials to be used in the Work, and the construction tools and equipment furnished by Contractor and its subcontractors for use in performing the work. Any materials or workmanship which Exxon considers unsatisfactory shall be removed and replaced at Contractor's expense. Neither inspection, waiving of inspection, nor acceptance by Exxon shall relieve Contractor of its obligation to furnish all materials and workmanship in accordance with specifications of each Release.
Plaintiffs further contend that Exxon exercised this right by daily inspections of the jobsite by Paul S. Kuber, its field contract coordinator. This court considered a similar contract provision in Triplette and found that the fact that the owner periodically inspected the jobsite to ensure work was being performed in accordance with the specifications did not constitute the exercise of operational control. 554 So.2d at 1363. A similar result was reached by the Third Circuit in Parker, where the court stated: "[A]lthough Boise monitored the work progress and inspected for quality, it did not exercise supervision and control over the work performed by Williams." 570 So.2d at 11-12. See also Williams v. Gervais F. Favrot Co., 499 So.2d 623, 626 (La.App. 4th Cir.1986), writ denied, 503 So.2d 19 (La.1987). Thus, we must conclude *221 that Exxon is insulated from liability for the negligent acts of Merit by virtue of Merit's independent contractor status.

WAS EXXON INDEPENDENTLY NEGLIGENT?
Although the independent contractor defense protects Exxon from liability for the acts of Merit, Exxon may still be liable for its own negligent acts or the negligent acts of its employees. In order for Exxon to be liable under article 2315, Crane must show Exxon owed him a duty, Exxon breached that duty, and his damages resulted from the breach. Thus, we must first determine whether Exxon owed a duty to Crane to protect him from the hazardous uncovered chute.
Duty is a question of law. Harris v. Pizza Hut, 455 So.2d 1364, 1371 (La.1984). The particular facts and circumstances of each individual case determine the extent of the duty and the resulting degree of care necessary to fulfill that duty. Socorro v. City of New Orleans, 579 So.2d 931, 938 (La.1991). Contractually, Exxon had no duty to provide a safe place for Merit's employees to work.[7] However, it maintained the right to inspect the job at any time to monitor compliance with its specifications. Exxon exercised this right by providing a field contract coordinator, Kuber. Kuber testified he "was the Exxon representative that Merit's supervision would interface with." He stated that his prime responsibility was to be the "contact man for Exxon." He spent an hour at the jobsite each day monitoring the progress of the job. According to Barrilleaux, Kuber's job was to "make sure [Merit was] following those rules or following those specifications ... and that it's being done in the way that Exxon wants it done." Although Gary N. Scott, Merit's job superintendent, testified Kuber never instructed him about the particular manner in which to perform any task at the jobsite, Kuber testified he personally reprimanded Merit verbally for safety violations on this job including failure to wear safety glasses, failure to wear safety harnesses, and substandard scaffolding.
If a person undertakes a task which he had no duty to perform, he must perform the task in a reasonable and prudent manner. Marsalis v. LaSalle, 94 So.2d 120 (La.App.Orl.Cir.1957). Negligent breach of a duty which has been voluntarily or gratuitously assumed may create civil liability. See Brown v. Tesack, 566 So.2d 955, 957 (La.1990); Harris v. Pizza Hut, 455 So.2d at 1371; Carlin v. Rapides Parish Police Jury, 584 So.2d 337, 339 (La. App. 3d Cir.1991); Barnes v. Bott, 571 So.2d 183, 186 (La.App. 4th Cir.1990), writ denied, 573 So.2d 1141 (La.1991); Restatement (Second) of Torts § 324(A).
We find, based on these facts, Kuber voluntarily assumed the task of monitoring the jobsite for violations of Exxon safety standards by Merit. This task had as its purpose the protection of Merit employees. Having assumed this responsibility, Kuber had a duty to perform it in a reasonable and prudent manner. In failing to notice the absence of a temporary covering over the chute, a clear violation of Exxon safety standard 162, he breached his duty toward Crane to exercise reasonable care in inspecting the jobsite for safety violations. Thus, Exxon is liable for its employee's negligent breach of an assumed duty which resulted in Crane's injury.

WERE MERIT AND/OR CRANE NEGLIGENT?

NEGLIGENCE OF CRANE
Crane was a senior journeyman millwright. He was the only experienced journeyman *222 working for Merit on this job; he supervised three or four helpers. He described himself as an "overseer," although he was not being paid "foreman pay." Crane was the senior Merit employee at the jobsite at the time of the accident; Scott, his supervisor, was not present when Crane was injured.
The accident occurred on Crane's second day working atop the slab. Crane testified he knew the chute was there and knew it was uncovered, but "that's as far as it went" because the chute didn't "stick out like a death trap." He stated: "I've been up on that slab a good bi[t] to know, you know, where things pretty well are. You got a mind, and when you're a worker out there, you keep your mind on conscientious things like that where you [are] going to go off the edge or something." He admitted that an uncovered chute on an elevated platform is a hazard; that he had the authority to ask that the chute be covered; but that he never did. Crane's expert, Howard, testified that a senior journeyman millwright should have been aware that temporary holes of this type ought to be covered for his own safety and the safety of those around him. Despite his knowledge of the hazardous uncovered chute, Crane was not sure whether he ever looked before he started backing up while removing the tarp.

NEGLIGENCE OF MERIT
Merit was required by its contract with Exxon to provide a safe place for its employees to work. It was also required to cover any temporary openings, such as the one which caused Crane's injury. Barrilleaux, Exxon's project engineer, testified Exxon has no expertise in construction; it relied on the contractor. Howard testified that the primary responsibility for protecting workers on a jobsite such as this one belongs to the contractor. Harry H. Frazier, Exxon's expert, agreed with Howard that the contractor was responsible for providing a temporary grating or cover.
Scott, Merit's job superintendent, and Richard F. Gill, Merit's president, both testified Merit was responsible for "detail work" such as installing temporary coverings. Gill stated Exxon could order him to do something regarding safety, but they should not be required to because "that is the responsibility of Merit to take care of." In this case, however, Merit failed to meet this responsibility; it is undisputed that the hole was uncovered at the time of Crane's accident.

QUANTIFICATION OF FAULT
Exxon assigns as error the trial court's assessment of only 10% fault each to Merit and Crane; it asks this court to increase the fault assessed to them. Merit, on the other hand, in its answer to Exxon's appeal, contends it was guilty of no fault; it asks this court to reverse the trial court's finding that it was 10% at fault.
We note at the outset that while the parties did not object to the quantification of Merit's fault, the Third Circuit held in the recent case of Gauthier v. O'Brien, 606 So.2d 915 (La.App. 3d Cir.1992), that the 1987 amendment of Louisiana Civil Code article 2324 "was not intended to require the consideration of a statutorily immune employer's negligence in apportioning fault in an employee's suit against a third party [tort-feasor]." Gauthier, 606 So.2d at 918. We decline to follow Gauthier, being of the opinion that this court was correct in finding that "it is clearly necessary to quantify an employer's negligence" under the current version of article 2324. Jarreau v. City of Baton Rouge, 602 So.2d 1124, 1127 n. 5 (La.App. 1st Cir.1992).
The Louisiana Supreme Court in Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967, 974 (La.1985), has set forth five factors to be considered in apportioning fault:
(1) Whether the conduct resulted from inadvertence or involved an awareness of the danger;
(2) the extent of the risk created by the conduct;
(3) the significance of what was sought by the conduct;
(4) the capacities of the actor, whether superior or inferior; and

*223 (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
Considering these factors in light of the facts of this case, we find considerable fault must rest with Merit. Merit employees were aware the uncovered chute was dangerous, but they failed to place a temporary covering over the chute. Merit was also aware employees were working on the slab in close proximity to the hole, and thus a significant risk was created. Merit had primary responsibility for providing a covering for the chute and was in a superior position to do so. Furthermore, there were no extenuating circumstances to reduce Merit's negligence.
Crane was aware of the hazard and could have covered the opening himself or requested that it be covered. However, he was preoccupied with doing his job at the time of the accident and had been on this job for only two days. He was in an inferior position to Merit, which had many employees, including Crane's supervisor, who were responsible for correcting hazards such as this.
Exxon's responsibility for this accident comes from Kuber's assumption of responsibility. Kuber carelessly failed to notice the open chute during his inspection of the jobsite, but his negligence is less than Merit's, since Merit and its employees were at the jobsite all day, every day, instead of only one hour per day as Kuber was.
Based on these facts, we find that fault should be allocated 50% to Merit, 20% to Crane, and 30% to Exxon.

DID THE TRIAL COURT ERR IN DISMISSING EXXON'S CROSS-CLAIM?
Exxon contends the trial court erred in dismissing its cross-claim against Merit for indemnity under Paragraph 12(C)(1) of the contract, which provides:
Exxon and Contractor shall indemnify, defend, and hold the other harmless from claims, demands, and causes of action asserted against the indemnitee by any person (including, without limitation, Contractor's ... employees ...) for personal injury ... resulting from the indemnitor's negligence.... Where personal injury ... is the result of the joint negligence ... of Exxon and Contractor, the indemnitor's duty of indemnification shall be in proportion to its allocable share of joint negligence....
(Emphasis added.) The trial court dismissed the cross-claim because in the trial court's opinion, if "plaintiff were allowed to recover tort damages from Exxon for which Exxon would be indemnified by Merit, then this would defeat the purpose of the worker's compensation act."
While employers are immune from tort claims brought by third parties for contribution or indemnification on the basis of an employer's negligence in causing an employee's injuries, there is no prohibition against an employer contractually agreeing to indemnify another party. Statutory immunity from tort liability does not limit an employer's ability to agree contractually that it will hold a third party harmless from damages to an employee attributable to the employer's negligence, or in this case, the joint negligence of Exxon and the employer. Jarreau v. City of Baton Rouge, 602 So.2d at 1126-1127; Berninger v. Georgia-Pacific Corp., 582 So.2d 266, 267-268 (La.App. 1st Cir.1991). Thus, the trial court erred in dismissing Exxon's cross-claim.
Since we have found Exxon's fault is greater than that of Crane, Crane may recover 50% of his recoverable damages against Exxon under Civil Code article 2324(B). Merit's "allocable share of joint negligence" in this case is 50%. Exxon is thus entitled to judgment over against Merit for 50% of the sums Exxon must pay to Crane, or 25% of the total judgment.

QUANTUM
Exxon contends the trial court awards of general damages, lost wages, and past medical expenses were excessive. Neither Exxon nor Merit has appealed the amount of the awards to Beverly Crane and Darrell Herman Crane for loss of consortium; that portion of the judgment is final. Plaintiffs *224 have not appealed the dismissal of the claim of Jeremy Stewart or the failure to award future medical expenses; those issues are final also.

GENERAL DAMAGES
The trial court awarded Crane $350,000.00 in general damages, finding Crane has a "failed back," will never be able to return to heavy manual labor, and will probably not be suited for light duty work in the future. Exxon contends this sum is grossly excessive and complains the trial court failed to consider Crane's history of back problems pre-existing this accident.
Dr. Robert M. Starns, a Hammond family practitioner, had been Crane's family doctor since Crane was seven years old. Crane's first experience with back pain occurred when he fell off a large Army truck in 1972 while stationed in Germany. He suffered pain in his low back, left leg, and groin. Army doctors diagnosed "substance sciatica," clipped a nerve in his abdominal area, put him through two courses of physical therapy, and assigned him to light duty. Starns helped Crane obtain "compassionate reassignment" in the United States so he could be near his family while he received medical care. He was honorably discharged from the Army in 1975.
In March 1982 Crane injured his ribs and back while bulldogging a steer. In April 1982 he saw Starns again for back pain, which he stated he had had intermittently since the Army accident. Starns referred him to Dr. John Schuhmacher, a neurosurgeon. Schuhmacher found no lumbar spasm. Crane had full range of motion of the lumbar spine, and a straight leg raising test was normal.[8] He diagnosed flank and groin pain (left) of unknown etiology and recommended further testing. Crane did not return for further tests.
Crane saw Starns for low back pain which radiated to his testes in October 1983, December 1983, February 1984, April 1986, January 1987, and February 1987. The 1986 problem was a result of playing ball, the January 1987 pain was caused by attempting to lift a heavy log splitter, and the February 1987 pain was caused by a motor vehicle accident. Starns usually prescribed anti-inflammatory medications. Starns also treated Crane for prostatitis during this time.
Crane saw Starns for neck and back pain related to the 1987 motor vehicle accident in June, July, and October of that year. Crane initially had spasm in the lumbar region, but a straight leg raising test was negative. Crane missed work only occasionally because of his back and neck pain.
Crane was injured at Exxon on January 25, 1988. He testified his entire leg went into the chute. His co-workers had to pull him out. Merit sent him to a Dr. Roland Louque, who told Crane he had pulled a muscle. The next morning Crane could not turn his head, but he drove back to Exxon so he could tell his boss he was seriously injured. Merit sent him back to Louque, who scheduled an appointment for him with Dr. Anthony S. Ioppolo, a Baton Rouge neurosurgeon, on February 3, 1988.
Ioppolo performed a CT scan and an MRI and found ruptured lumbar disks at L-4 and L-5. He scheduled an automative percutaneous lumbar diskectomy on March 13, 1988. This procedure involves removing ruptured disk material through a hollow needle inserted into the patient's back under local anesthesia. However, Ioppolo was unable to position the needle properly and was forced to perform a conventional disk excision at the L-4 level. Crane was hospitalized for a week following surgery.
Crane continued to have lumbar spasm, as well as decreased ankle reflexes and decreased sensation in the right foot. A post-surgical myelogram caused Crane headaches but showed no ongoing surgical problems. However, electrical studies showed severe L-4 nerve root dysfunction. Ioppolo prescribed a TENS unit, and Starns prescribed muscle relaxers, pain medication, and antidepressants. Starns testified that even though Crane denied being depressed, his depression was visible.
*225 Ioppolo referred Crane to Dr. William P. Hackney, an anesthesiologist, for a series of epidural steroid injections. Hackney described the injection as being done with a "reasonably dull" needle of "pretty big size." Crane felt even worse after the first injection and thus did not return for the remainder of the series.
Ioppolo described the back surgery as a failure. Crane is not a candidate for further surgery. As of the time of trial he continued to have daily pain. Ioppolo assigned Crane a 20% disability of the body as a whole.
Starns stated Crane is losing muscle mass and muscle control in his right leg which causes him to fall. In 1990 Crane fell against a heater when his leg gave way, resulting in a three-day hospitalization to treat his burned arm. Crane also suffers from impotence as a result of the accident. Starns described Crane as "relatively impotent most of the time." Exxon attempted to show Crane's impotence was caused by his prostatitis. However, Crane testified at trial that he was not impotent before the accident, and Starns testified Crane never complained of impotence to him before the Exxon accident.
Starns gave the following assessment of the changes in Crane caused by the accident:
Darrell was functioning very well up until this accident.... Darrell was functioning at a good high level.... He had some mechanical problems with the back..., but he was functioning as a total human being and particularly in his family relationships and in his ability to bring home a paycheck. Darrell was totally functional. Since the accident, Darrell is nonfunctional, he's depressed, he is withdrawn to some extent, he's had family problems related to the impotence.... I think he feels totally emasculated.... He feels insignificant and frustrated....
He gave the following description of Crane's loss of mobility as a result of the accident:
He doesn't complain very much. But when you watch him walk, he walks with a cane and he walks very slowly, very carefully. He walks like an old, old man who is afraid his knees are going to give way, and apparently they well might.... [A]s time goes by, there is less and less that he is able to do.
Crane testified that since the accident he can no longer climb stairs, kneel, crawl, stoop, stand on one leg, or squat. This assessment was borne out by the two functional capabilities assessments. He can no longer hunt, fish, play the drums (he was drummer in a band for 16 years before the accident), play basketball with his sons (he was an all-state basketball player in high school), do car and house repairs, or enter dance contests with his wife. He described himself as a "couch monkey."
Based on these facts, we find the trial court did not abuse its discretion in awarding Crane the sum of $350,000.00 for general damages.

PAST LOST AND FUTURE LOSS OF INCOME
Crane had worked as a millwright for 14 years and had completed the union apprenticeship program. He was earning $12.00 per hour at the time of this accident, but he normally worked union jobs where he earned $13.85 to $15.50 per hour. He stated he averaged at least 10 months per year working through the union hall, and with overtime he earned $28,000.00 to $30,000.00 per year. He was not earning overtime working for Merit.
Starns testified Crane is currently unable to engage in any kind of gainful employment, and his condition is deteriorating. Ioppolo testified Crane can never work as a millwright again. He stated he would concur with the findings on the functional capacities assessment as to the recommendations concerning Crane's employability. Those findings are that Crane can function at a sedentary physical demand level with infrequent lifts up to five pounds. The evaluation stated Crane "may be able to perform a job in which he is [in] control of the amount of time in which he is required to maintain a certain position or organize daily tasks in which he is not required to squat or perform repetitive lifting or carrying." Exxon introduced a vocational rehabilitation *226 report which concluded Crane is employable and suggested a labor market survey be conducted to identify specific job possibilities. However, such a survey was never conducted.
The trial court found it "difficult to imagine work for which [Crane] would be suited in the future." He awarded Crane $86,900.00 for lost wages to date of trial and $499,733.00 for future loss of income, adopting the findings of G. Randolph Rice, Ph.D., Crane's economic expert.[9] Rice based these figures on Crane's hourly rate at the time of the accident, $12.00 per hour for the first 40 hours per week and $18.00 per hour overtime. Rice assumed Crane would work 45 hours per week 50 weeks per year.
Exxon contends the trial court erred in adopting Rice's figures. Exxon further contends the figures of its expert, Kenneth J. Boudreaux, Ph.D., are more accurate because Boudreaux used an average of Crane's earnings in 1985 through 1987, based on Crane's tax returns. In calculating Crane's future loss of income, Boudreaux assumed Crane was capable of earning minimum wage as of the date of trial and will be able to earn minimum wage for the remainder of his work life expectancy.
The trial court has the prerogative to accept the testimony of one economic witness over another if that economic evaluation is reasonably supported by the evidence. American Motorists Ins. Co. v. American Rent-All, 566 So.2d 121 (La. App. 5th Cir.1990), aff'd in part, amended in part, rev'd in part, 579 So.2d 429 (La. 1991). Awards of future loss of income are speculative by nature and cannot be calculated with mathematical certainty. The trial court necessarily has much discretion in fixing such awards, Holmes v. Texaco, 422 So.2d 1302 (La.App. 5th Cir.1982), although awards for past lost earnings which can be mathematically calculated from documentary proof are not subject to the much discretion rule. Eddy v. Litton, 586 So.2d 670 (La.App. 2d Cir.1991), writ denied, 590 So.2d 1203 (La.1992).
Rice's calculations of Crane's past lost wages were based on the hourly rate Crane was earning at the time of the accident. We find the trial court was not manifestly erroneous in accepting those calculations for past lost wages. We further find the trial court was not manifestly erroneous in finding Crane's loss of future income would extend for the remainder of his life and that he would be unable to engage in even sedentary work. Based on this factual finding, we find the trial court did not abuse its much discretion in accepting the calculations of Rice regarding Crane's future loss of income.

PAST MEDICAL EXPENSES
The parties stipulated Fidelity paid weekly compensation payments to Crane totalling $42,089.50 and paid medical expenses of $32,108.51 to Crane or on Crane's behalf. The trial court awarded Crane $32,108.51 for past medical expenses. The trial court then ordered that $74,535.00,[10] reduced by the percentage of negligence of Crane and Merit, be awarded the intervenor out of Crane's award.
Exxon contends the trial court erred in awarding past medical expenses to Crane, asserting the trial court has permitted double recovery. This contention is without merit. Under the trial court's judgment, the past medicals awarded to Fidelity are to be paid out of Crane's award. Thus, Exxon would pay past medicals only once, Fidelity would receive past medicals only once, and Crane would ultimately receive nothing for past medicals. To bring the language of the judgment into closer accord with LSA-R.S. 23:1103, however, we *227 shall revise the language of the judgment to cast Exxon directly for the intervention, including the medical expenses, and delete the award of past medical expenses to Crane.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is amended, and as amended, is affirmed. The judgment is hereby revised to read as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of intervenor, THE FIDELITY AND CASUALTY COMPANY OF NEW YORK, and against defendant, EXXON CORPORATION, in the sum of $37,267.50 (representing the total compensation and medical expenses paid by it of $74,535.00, less a reduction of $37,267.50 (50%) for the comparative negligence of Darrell Crane and Merit Industrial Contractors, Inc.),[11] together with legal interest thereon from date of judicial demand until paid, to be paid with precedence and priority to intervenor before any amounts are paid by Exxon to plaintiffs.
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiff, DARRELL CRANE, and against defendant, EXXON CORPORATION, in the sum of $447,103.25 (representing his total damages of $936,633.00 ($350,000.00 general damages, $86,900.00 past lost wages, and $499,733 future loss of income), less a reduction of $468,316.50 (50%)[12] for the comparative negligence of Darrell Crane and Merit Industrial Contractors, Inc., less a further reduction of $21,213.25[13] for the compensation payment reimbursement to intervenor out of Darrell Crane's recovery), together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiff, BEVERLY SIMEON CRANE, and against defendant, EXXON CORPORATION, in the sum of $25,000.00 (representing her damages for loss of consortium of $50,000.00, less a reduction of $25,000.00 (50%) for the comparative negligence of Darrell Crane and Merit Industrial Contractors, Inc.), together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiff, DARRELL HERMAN CRANE, and against defendant, EXXON CORPORATION, in the sum of $10,000.00 (representing his damages for loss of consortium of $20,000.00, less a reduction of $10,000.00 (50%) for the comparative negligence of Darrell Crane and Merit Industrial Contractors, Inc.), together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment on the cross-claim in favor of EXXON CORPORATION, and against MERIT INDUSTRIAL CONTRACTORS, INC., in the sum of $259,685.37 (representing 50% of the sums Exxon Corporation is obligated to pay to plaintiffs and intervenor totaling $519,370.75), together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all costs of trial and appeal be allocated 50% to Merit Industrial Contractors, Inc., 30% to Exxon, and 20% to plaintiffs.
*228 AMENDED, AND, AS AMENDED, AFFIRMED.
NOTES
[1] Exxon Corporation was incorrectly referred to in plaintiffs' petition as "Exxon Corporation, U.S.A."
[2] Crane's son's name is spelled "Jeramy" in the caption but is spelled "Jeremy" in the body of the petition and in the transcript.
[3] Although the trial court gave no reason for dismissing Stewart's claim, it is clear that as a stepchild he was not entitled to damages for loss of consortium. La.C.C. arts. 2315 and 2315.2.
[4] Exxon Safety Standard No. 162(III) provides that any floor opening measuring 12 inches or more in its least dimension must either be attended, covered with suitable decking (such as exterior plywood), or enclosed with a temporary standard railing. Addendum II of Exxon's regulations entitled "Contractors' Responsibilities for Safety, Health, Security, and Traffic Regulations," Regulation III(19), requires contractors to place appropriate rigid barricades around temporary floor openings.
[5] Exxon contends it did not have garde over the construction site because Merit was functioning as an independent contractor at the time of the accident. In Olsen v. Shell Oil Co., 365 So.2d 1285, 1292 (La.1978), the Louisiana Supreme Court held that an owner may not divest itself of article 2322 strict liability by attempting to transfer garde by contract. Recently, in Doughty v. Insured Lloyds Ins. Co., 576 So.2d 461, 464 (La.1991), the supreme court held that ownership is not necessarily equal to garde. However, the issue of whether a landowner who has relinquished control over a construction site to a general contractor can be considered still to have the garde over the site has not been decided by our supreme court or this circuit. In Herron v. Lincoln Property Co., 525 So.2d 1189, 1190 (La.App. 5th Cir.1988), the Fifth Circuit decided that question in favor of the contractor. When the issue last arose in this circuit, this court found it unnecessary to decide this "troublesome question" because of its finding that the accident was caused solely by victim fault. Stewart v. Sam Wallace Indus. Co., 409 So.2d 335, 340 (La.App. 1st Cir.1981), writs denied, 413 So.2d 497 (La.1982).
[6] Although Exxon pleaded statutory employer status as an alternative affirmative defense, it did not attempt to prove that defense at trial because it clearly did not have the necessary control over Crane to be his statutory employer.
[7] The contract provided, in pertinent part, at Paragraph 7(A):

Contractor shall provide a safe place to work for its employees.... Contractor shall notify his employees and subcontractors of all health and safety hazards to which they may be exposed and shall supply his employees with all necessary personal protective equipment and enforce such operating practices as are necessary to provide a safe place to work. Should Contractor encounter conditions at the work site that indicate its employees are potentially exposed to unsafe conditions, hazardous substances, or materials, Contractor will immediately bring this fact to the attention of Exxon and Contractor shall ... enforce such operating practices as are necessary to provide a safe place to work.
[8] A positive straight leg raising test indicates disk involvement.
[9] Although the trial court stated in the Reasons for Judgment that he was awarding $499,773.00 for future loss of income, the judgment, which is controlling, awarded $499,733.00.
[10] The parties stipulated that these figures totalled $74,198.01 and that Fidelity should receive the first $74,198.01 of the plaintiff's judgment. Since none of the parties have assigned as error the $336.99 discrepancy between the stipulation and the judgment, the $74,535.00 figure in the judgment is final.
[11] This reduction is limited to 50% rather than 70% by effect of LSA-R.S. 23:1101(B) and La. C.C. art. 2324(B). Although the stipulation provides Fidelity will receive the "first $74,198.01 of said judgment," R.S. 23:1101(B) mandates that the intervenor's recovery be "identical in percentage to the recovery of the employee ... against the third person...."
[12] This reduction is limited to 50% by the effect of Civil Code article 2324(B).
[13] The intervenor was awarded $37,265.50, representing 50% of $74,535.00. This must be paid from Crane's award. By deleting the award for past medicals from Crane's award, his recovery was reduced by $16,054.26 (50% of the total medicals of $32,108.51). The remainder of the intervenor's award, $21,211.24 ($37,265.50 minus $16,054.26), must be deducted from Crane's recovery.