ROSEMARY LEDET, Judge.
11This is a personal injury suit. The sole issue presented is whether the trial court erred in granting the motion for summary judgment filed by the defendant, Apollo Marine Specialties, Inc. Finding genuine issues of material fact exist precluding the grant of summary judgment, we reverse.
FACTUAL AND PROCEDURAL BACKGROUND
On March 27, 2003, William Teter allegedly injured his back while unloading a heavy spool (or coil) of rope being delivered by Apollo Marine to the job site where he was working. Mr. Teter was working as an ironworker foreman for American Bridge Company on the Florida Avenue Bridge project. Apollo Marine was one of American Bridge’s material suppliers.
On March 26, 2004, Mr. Teter filed this suit against, among others, Apollo Marine. In his petition, he alleged that on the day of the accident an Apollo Marine delivery truck driver arrived at the job site to deliver a giant spool of heavy marine rope; Apollo Marine had only one employee delivering the rope. Since the spool of rope was too heavy for Apollo Marine’s driver to remove from the truck by | ¿himself, Mr. Teter was asked to assist the driver in unloading it. While unloading the spool of rope, Apollo Marine’s driver negligently pushed the heavy spool of rope too hard causing it to fall off the truck. In attempting to turn away to avoid being hit by the heavy spool of rope, Mr. Teter slipped and fell in oil. •
Mr. Teter averred that Apollo Marine, through its driver, was negligent in the following four non-exclusive respects: (i) failure to have adequate employees to unload material, (ii) failure of its employees to properly unload the heavy spool of rope, (iii) failure to see that Mr. Teter was in the path of the spool of rope, and (iv) failure to warn Mr. Teter that the driver was shoving the spool of rope. Apollo Marine answered denying liability and asserting that, if in fact the accident occurred, the accident was the result of Mr. Teter’s own *592 voluntary exposure to “the normal hazards of his occupation.” Apollo Marine also asserted comparative fault on the part of Mr. Teter and his employer, American Bridge.[1]
On March 15, 2005, Mr. Teter died. On April 30, 2006, Mr. Teter’s surviving spouse, Yvette Walters Teter, both individually on behalf of her deceased husband and on behalf of their two minor children, filed a supplemental and amending petition substituting herself as proper party plaintiff. Alleging that Apollo Marine’s negligent actions caused Mr. Teter’s death, Mrs. Teter asserted a |swrongful death claim and a survival action. See La. C.C. arts. 2315.1 and 2315.2. Apollo Marine answered admitting Mrs. Teter’s status as surviving spouse and as representative of Mr. Teter’s minor children, but denying liability. Apollo Marine reaffirmed and reiterated its averments and affirmative defenses set forth in its prior answer.
On April 25, 2012, Apollo Marine filed a motion for summary judgment. Apollo Marine supported its motion with the deposition testimony of the following five witnesses: Mr. Teter, Richard Foster, Ron Williams, Dimitrios Fronistas, and Roosevelt Batiste. To provide a factual background for deciding this .case, we briefly summarize the deposition testimony.

William Teter

On the day of the accident, Mr. Teter was working for American Bridge as an ironworker foreman. At about 10:30 a.m. that morning, he received a call from a supervisor (either Macy Terrell, his direct supervisor, or Dick Foster, another supervisor) ordering him to help an Apollo Marine truck driver unload a spool of rope, which was to go on a certain boat. According to Mr. Teter, his supervisor gave him no unloading instructions “because the truck driver usually takes care of that.” He stated that “this was not a routine thing” that he did as part of his job.
Although Mr. Teter did not know the Apollo Marine driver’s name, he described the driver as an African American (black) male in his mid-thirties. Mr. Teter testified that the driver told him that he could not move the spool by himself and asked him for assistance in moving it. He explained that the driver was on the |4flatbed of the truck trying to push the spool, which was located near the cab of the truck. The driver was using both his arms and legs and was grunting. At the driver’s request, Mr. Teter climbed onto the flatbed of the truck to help the driver. The driver managed on his own to push the spool two or three feet towards the rear of the truck. However, the flatbed of the truck had dents or bolts in it, and the spool became hung up. In order to determine what the spool was hung up on, Mr. Teter *593 climbed off the truck. From the ground he was able to see where the spool was hung up. He told the driver that he would lift the spool over the plate or whatever it was hung up on.
Mr. Teter acknowledged that the spool of rope was five to six feet in diameter and weighed at least four or five hundred pounds. Nonetheless, he testified that it was possible for him to lift the spool because it was not “dead weight;” he explained:
But it was just, it was kind of teeter tottering at that point. It was, like them bolts, it was like, it was kind of like riding on those at that point. It wasn’t like it was like dead weight really right at that point. But I told him [the driver] just hold up a second, and I’ll lift up just a little bit and we would get the bolts over the top of that edge.
According to Mr. Teter, the next thing that occurred was the spool came down on top of him; he explained:
I told him [the driver] look, I’ll lift up just a little bit, and we’ll get it over the top. We wouldn’t put a lot of pressure onto them, don’t shove on it hard, but just lift up just to get them bolts up over this where it was handing up. Okay. When I lifted this up, he shoved as hard as he could, and it came down on top of me. It kind of hit me in the shoulder and kind of knocked me sideways.
|fiMr. Teter testified that the blow twisted him around and that he fell back and landed on his hands.
After lunch Mr. Teter reported the accident to one of his supervisors but continued to work. Over night his pain increased. Early the next morning, he reported the accident to American Bridge’s office manager, Richard Foster, and a first report of injury form was completed. On that same day, he sought medical treatment for his back injury. As noted elsewhere, Mr. Teter died after this suit was filed.

Richard, Foster

Mr. Foster testified that Mr. Teter first reported the accident to him between 6:00 and 6:30 a.m. on the day after it occurred. On that morning, Mr. Foster completed the first report of injury form with Mr. Teter. In the written report, Mr. Teter described the accident as occurring when he was “unloading a spool of 2" manila rope from a truck. Injured’s feet slipped on muddy ground surface and as the injured took the weight of the spool of manila rope he felt pain in his lower back.” In his handwritten statement that was attached to the report, Mr. Teter further described the accident as follows:
On March 27, 2003, I was working in yard, and I was in the process of off unloading a spool of manila rope about 10:30 AM, and the spool got caught on bed of truck, as I was pulling on the spool it came loose from its hold. I tried to hold it and ground was wet causing me to slip slightly and I went home that evening. The next day it was hurting my back so I went to the doctor after reporting what happened to RC Foster Office Manager.
On the report, it is indicated that there were no witnesses to the accident. The report does not mention Apollo Marine or its driver.
| (Ron Williams
Ron Williams, American Bridge’s superintendent, testified that Mr. Teter reported the accident to him either on the day of the accident or the next day. Mr. Teter told him that “he was trying to move this spool of line [rope] on the truck and that he pulled something in his back.”
Mr. Williams described American Bridge’s standard procedure for receiving *594 deliveries as follows: (i) when a delivery truck arrives at American Bridge’s work site, the driver is required to stop at the office and to advise the office manager, Mr. Foster, of the delivery; (ii) Mr. Foster then calls a superintendent (either Mr. Williams or Macy Terrell) to advise that a delivery truck is there; and (iii) the superintendent then calls a foreman to take care of getting the materials unloaded.
Mr. Williams testified that the materials that were delivered to American Bridge’s job site were heavy and could only be unloaded by using either a crane or other equipment. He identified the equipment that American Bridge had available at its job site for unloading as including a nineteen-ton boom truck, a five-thousand pound capacity loader with forks on it, and three crawler cranes. He testified that crane operators were always available; indeed, there were six operators on American Bridge’s job site at the time of the incident. He explained that because the contractors delivering materials did not have the necessary equipment, the contractors were not responsible for unloading materials. Mr. Williams testified that Mr. Teter had equipment available to him to unload the spool of rope and that |7he did not recall Mr. Teter explaining why he did not use such equipment to unload the rope.

Dimitrios Fronistas

Mr. Fronistas, one of Apollo Marine’s owners, testified that when Apollo Marine hires drivers it provides them with the following safety instructions: never unload the truck; only the buyer should unload the truck; and if the buyer is unable to unload the truck, return with the unloaded material to Apollo Marine. Mr. Fronistas acknowledged that these safety instructions verbally are given to drivers when they are hired, that Apollo Marine has no written safety manual, and that it does not hold regular safety meetings with its drivers.
Mr. Fronistas identified the shipping (or dray) receipt dated March 26, 2003, for American Bridge’s order of one “2" X 600' SPOOL OF POLY. PRO ROPE.” Although the receipt refers to a spool of rope, he indicated that this was a mistake. He explained that this type of rope was not shipped on a spool (or reel); rather, it was wound up in a coil. The coil of rope that Apollo Marine delivered to American Bridge on March 27, 2003, weighed 414 pounds.
Mr. Fronistas indicated that the shipping receipt was signed by Mr. Teter, acknowledging American Bridge’s receipt of the materials. Although the shipping receipt did not identify the Apollo Marine delivery driver, Mr. Fronistas testified that he was certain the driver who made the delivery was Roosevelt Batiste. He explained that he was certain because during the pertinent time Mr. Baptiste was the driver who made 99% of Apollo Marine’s deliveries. He described Mr. Ba-tisteis an African American man of medium built, not overweight, and about 5'9" or 5'10" tall. He further testified that subsequent to this incident Mr. Batiste was terminated for unrelated reasons.

Roosevelt Batiste

Mr. Batiste testified that he formerly worked for Apollo Marine as a delivery driver. In 2003, he regularly (about three times a week) made deliveries to the American Bridge work site. The primary product that he delivered to that work site was heavy cable wire, which was wound on a spool for shipping and weighed between 1400 to 1500 pounds. Mr. Batiste testified that it was physically impossible to manually load or unload a spool of wire because it was too heavy.
Mr. Batiste confirmed Mr. Fronistas testimony that the rope delivered to Amer *595 ican Bridge was not shipped on a spool; rather, the rope was rolled up by hand, tied up, and thrown onto pallets. He described the rope as yellow and black in color and big, heavy barge rope. He estimated that the rope delivered to American Bridge weighed between 400 and 500 pounds.
Mr. Batiste testified that American Bridge’s employees were solely responsible for unloading materials from Apollo Marine’s delivery trucks. Apollo Marine did not provide any equipment to unload materials at American Bridge or any other site. According to Mr. Batiste, Apollo Marine’s procedure was that if equipment was unavailable to unload the truck, he was to bring the materials back to Apollo Marine. He stated that this was the procedure he always followed. In response to the hypothetical question of what he would do if he arrived at | aAmerican Bridge and no one was available to unload his truck, Mr. Batiste answered that he would “[b]ring it all the way back” to Apollo Marine’s shop and go back another time.
Mr. Batiste did not remember making the delivery to American Bridge on March 27, 2008. When shown the shipping receipt for the delivery, Mr. Batiste testified that “somebody else came there with that. That was not me.” He stated that they must have identified the wrong driver. Mr. Batiste pointed out that if a pallet had fallen off his truck he would remember it, and an accident report would have been prepared.
Mr. Batiste denied ever meeting Mr. Teter. He explained that every time he made a delivery at American Bridge, he dealt with the same person — a black male with a Jamaican accent — who always unloaded his truck. When confronted with Mr. Teter’s allegations regarding what occurred on the date of the accident, Mr. Batiste replied that it “[n]ever happened” and that it was not possible. He testified that he never saw anyone at any time try to catch a spool of cable wire or a pallet of rope that was being taken off of the back of an Apollo Marine delivery truck. He denied ever letting anyone onto the flatbed of his truck. He further denied ever pushing a spool of wire or a pallet of rope off the back of his truck while making a delivery at American Bridge. He explained that he would never do so because he did not want to hurt himself. He still further denied that he had the physical strength to push, pull, or slide either a spool of cable wire or a pallet of rope. Whether it was a coil of yellow and black rope or a spool of heavy cable wire, he explained that the material had to be unloaded by using a crane or heavy equipment to lift it off the truck; the material could not be rolled off the truck. He 11fltestified that a pallet was never unloaded by hand at American Bridge’s work site; American Bridge always used one of its forklifts or other equipment to unload them. Because he could not remember the incident with Mr. Teter, Mr. Batiste speculated that either it never happened or another Apollo Marine driver made the delivery.
In its motion, Apollo Marine, citing the deposition testimony, enumerated the following undisputed material facts:
• On or about March 27, 2003, Apollo Marine had one black (or African American) driver, Roosevelt Batiste, who made 90-99% of all deliveries for Apollo Marine.
• On or about March 27, 2003, Roosevelt Batiste delivered a cod of rope to the American Bridge work site.
• At all pertinent times hereto, Apollo Marine instructed its delivery drivers that they were not to unload any equipment or supplies from its trucks when making an on-site delivery.
*596 • Apollo Marine had no forklift or equipment on its delivery trucks to unload its trucks when making an on-site delivery.
• All of. Apollo Marine’s customers, including American Bridge, were required to use their own equipment to unload supplies off of Apollo Marine’s delivery trucks.
• The rope delivered to American Bridge on March 27, 2003, was not wound on a spool, but was coiled up, weighed approximately 414 pounds, and was placed on a pallet on Apollo Marine’s delivery truck with a forklift.
• American Bridge’s employees were responsible for unloading Apollo Marine’s deliver truck on March 27, 2003.
• American Bridge had equipment available at its work site to unload Apollo Marine’s delivery truck on March 27, 2003, which included a 19-ton boom truck, a 5000 pound capacity loader, and several crawler cranes.
• On March 27, 2003, William Teter’s supervisor at American Bridge instructed Mr. Teter to unload the rope from Apollo Marine’s truck at American Bridge’s work site.
|n* William Teter did not use any of American Bridge’s equipment to unload the rope delivered by Apollo Marine’s delivery truck on March 27, 2003.
• William Teter died on March 15, 2005 as a result of the combined effect of multiple drugs in his system, which caused respiratory depression resulting in visceral congestion and pulmonary edema.
Apollo Marine contended that it was entitled to summary judgment on two grounds. First, it owned no duty to protect Mr. Teter from his alleged injuries. Second, neither it nor its employee created, caused, or contributed to Mr. Teter’s alleged fall and injury, if any, on March 27, 2003, or his subsequent death.
Opposing the summary judgment, Mrs. Teter introduced, among other things, Mr. Teter’s deposition, her own affidavit, and an affidavit from the coroner, Dr. Karen F. Ross, regarding the cause of Mr. Teter’s death.[2] Mr. Teter’s testimony is summarized above. Mrs. Teter, in her affidavit, attested that before the accident her husband had not suffered any back injuries or back problems. She further attested that her husband had been injured at work while trying to unload rope from a truck. The coroner, in her affidavit, attested:
• The medications Mr. Teter took before 2005 were not related to his death.
• The levels of drugs in Mr. Teter’s system on autopsy were not in the lethal range.
• Mr. Teter did not commit suicide. His death was accidental.
• The synergism associated with the use of these drugs led to Mr. Teter’s respiratory depression and death.
• What this means is that each drug alone can cause respiratory depression, and together cause even greater respiratory depression.
|1⅞* Review of the medical records and other evidence confirms that the March 27, 2003, accident caused Mr. Teter’s back injury, which caused his need for the prescribed medications, which then caused his death.
*597 • In addition to the multiple respiratory depressant drugs present, Mr. Teter also had complications of morbid obesity including an enlarged and dilated heart. This may result in pulmonary edema also and therefore to his death; however, [i]t is my opinion that the drug effects superimposed upon this natural disease were the immediate cause of his death.
Following a hearing, the trial court found there were no genuine issues of material fact and thus granted Apollo Marine’s motion for summary judgment. The trial court did not provide written reasons for judgment. This appeal followed.
STANDARD OF REVIEW
The standard of review of a trial court’s ruling granting a motion for summary judgment, pursuant to La. C.C.P. arts. 966 and 967 and the jurisprudence, can be summarized as follows:
Appellate courts review the grant or denial of a motion for summary judgment de novo, using the same criteria applied by trial courts to determine whether summary judgment is appropriate. This standard of review requires the appellate court to look at the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, to determine if they show that no genuine issue as to a material fact exists, and that the mover is entitled to judgment as a matter of law. A fact is material when its existence or nonexistence may be essential to the plaintiffs cause of action under the applicable theory of recovery; a fact is material if it potentially insures or precludes recovery, affects a litigant’s ultimate success, or determines the outcome of the legal dispute. A genuine issue is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, no need for trial on that issue exists and summary judgment is appropriate. To affirm a summary judgment, we must find reasonable minds would inevitably conclude that the mover is entitled to judgment as a matter of the applicable law on the facts before the court.
The summary judgment procedure is designed to secure the just, speedy and inexpensive determination of actions. Summary judgments are favored, and the summary judgment procedure shall be construed to accomplish these ends. The code provides that where [as in the instant case] the party moving for summary judgment will not bear the burden of proof at trial, their burden does not require them to negate all essential elements of the adverse party’s claim, but rather to point out to the court that an absence |13of factual support exists for one or more elements essential to the adverse party’s claim. Thereafter, if the adverse party fails to produce factual support sufficient to establish that it will be able to satisfy its evidentiary burden of proof at trial, no genuine issue of material fact exists, and the movant is entitled to judgment as a matter of law. The adverse party cannot rest on the mere allegations or denials of his pleadings when a motion for summary judgment is made and supported by affidavits, but is required to present evidence establishing that material facts are still at issue.
Johnson v. Loyola University of New Orleans, 11-1785, pp. 7-8 (La.App. 4 Cir. 8/8/12), 98 So.3d 918, 928-24; see also McGowan v. Housing Authority of New Orleans, 12-1418, p. 12 (La.App. 4 Cir. 3/27/18), 113 So.3d 1143, 1148, 2013 WL 1247814. Despite the legislative mandate favoring summary judgment, factual inferences reasonably drawn from the evidence *598 must be construed in favor of the party opposing the motion, and all doubt must be resolved in the opponent’s favor. Willis v. Medders, 00-2507, p. 2 (La.12/8/00), 775 So.2d 1049, 1050.
As noted in Johnson, whether a particular disputed fact is material for purposes of summary judgment must be determined in light of the substantive law applicable to the case. See Warren v. Kenny, 10-1580, p. 6 (La.App. 4 Cir. 4/27/11), 64 So.3d 841, 846 (citing Smith v. Our Lady of the Lake Hosp., Inc., 93-2512, p. 27 (La.7/5/94), 639 So.2d 730, 751) (noting that “[a] ‘material’ fact is ‘one that would matter on the trial on the merits,’ ” and that “[t]he applicable substantive law determines materiality.”).
DISCUSSION
It is undisputed that all of Mrs. Teter’s claims against Apollo Marine are negligence claims. To prevail on a negligence claim, a plaintiff is required to prove the following five elements:
1. proof that the defendant had a duty to conform his conduct to a specific standard (the duty element);
|M2. proof that the defendant’s conduct failed to conform to the appropriate standard (the breach element);
3. proof that the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-faet element);
4. proof that the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and
5. proof of actual damages (the damages element).
Fowler v. Roberts, 556 So.2d 1, 4 (La.1989). The cause-in-fact and breach elements present questions of facts; the duty and scope of liability or scope of protection elements present questions of law. See Gammill v. Invacare Corp., 08-0833, p. 3 (La.App. 4 Cir. 12/17/08), 2 So.3d 557, 559 (citing Meany v. Meany, 94-0251 (La.7/5/94), 639 So.2d 229) (noting that “[t]he question of whether a duty is owed, as well as the scope of that duty, is a question of law. Breach of duty and causation are to be determined by the trier of fact.”)
In this case, Apollo Marine contends, and the trial court apparently agreed, that no duty exists as a matter of law. In support of this position, Apollo Marine cites the deposition testimony of Mr. Williams, Mr. Fronistas, and Mr. Batiste that American Bridge, through its employees, was responsible for unloading the rope and that American Bridge provided the equipment to do so. Apollo Marine thus contends that it owned no duty to provide for Mr. Teter’s safety in unloading the rope. Mrs. Teter counters that when Mr. Baptiste, on Apollo Marine’s behalf, decided to violate Apollo Marine’s safety rule by manually removing the rope, he had a duty to remove it in a safe manner.
Although duty is a question of law, summary judgment on the issue of duty is proper “only where no duty exists as a matter of law and no factual or credibility disputes exist.” Parish v. L.M. Daigle Oil Co., 98-1716 (La.App. 3 Cir. 6/23/99), 742 So.2d 18, 25. Such is not the case here. The record reflects that the trial court was presented with two different versions of the underlying facts pertinent to the duty issue. On the one hand, Mr. Teter testified that Apollo Marine’s driver (apparently Mr. Batiste) was not only responsible for unloading the truck, but also took an active role in the process of unloading the truck. Mr. Teter testified that Apollo Marine’s driver asked him to help unload the truck. Mr. Teter further testified that the driver negligently pushed the spool too *599 hard causing it to roll off the truck. On the other hand, several witnesses testified that American Bridge was solely responsible for unloading the truck.
For purposes of deciding a summary judgment motion, a court cannot make credibility determinations. Monterrey Center, LLC v. Education Partners, Inc., 08-0734, p. 10 (La.App. 1 Cir. 12/23/08), 5 So.3d 225, 232. In deciding a motion for summary judgment, the trial court must assume that the testimony of all the witnesses is credible. Independent Fire Ins. Co. v. Sunbeam Corp., 99-2181, pp. 16-17 (La.2/29/00), 755 So.2d 226, 236. Assuming that Mr. Teter’s testimony is credible, we find that Apollo Marine, through its employee’s actions, assumed a duty to do so safely. See Crane v. Exxon Corp., 613 So.2d 214, 221 (La.App. 1st Cir.1992), writs denied in part, granted in part on other grounds, and remanded, 620 So.2d 858 (La.1993) (holding that “[i]f a person undertakes a task which he had no duty to perform, he must perform the task in a reasonable and prudent manner”). “A duty of protection which has been voluntarily assumed must be performed with due care.” Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364, 1369 (La.1984). Assuming Mr. Teter’s testimony to be true for purposes of this motion for summary judgment, we find that Apollo Marine assumed a duty to |16exercise due care in unloading the rope. Whether that duty was breached is a question of fact not before us on appeal.
Apollo Marine alternatively argues that its conduct cannot be determined to be a cause-in-fact of Mr. Teter’s alleged injuries and subsequent death because it was physically impossible for the accident to happen as Mr. Teter alleged. Apollo Marine, however, cites no support for this argument. Contrary to Apollo Marine’s contention, we find the trial court was presented with two contradicting versions of whether the accident was physically possible. As discussed earlier, Mr. Teter testified that the spool of rope was not “dead weight” and that it was possible for him to lift the spool of rope. He further testified that Apollo Marine’s driver was able to push the spool and move it himself and that its driver pushed it too hard causing it to roll off the truck. Mr. Batiste, on the other hand, testified that it was impossible for either Mr. Batiste or Mr. Teter alone, or both of them together, to manually move or lift the spool (coil) of rope that weighed over 400 pounds. As noted earlier, a trial court in deciding a motion for summary judgment cannot make credibility calls and must assume the testimony of all of the witnesses is credible. Monterrey, 08-0734 at p. 10, 5 So.3d at 232. The trier of fact must make the credibility determination between the two versions of whether the accident was physically possible. Stated otherwise, there is a genuine issue of material fact regarding whether the accident was possible.
Summarizing, given the existence of multiple genuine issues of material fact, the trial court legally erred in granting Apollo Marine’s motion for summary judgment.

U,DECREE

For the foregoing reasons, the judgment of the trial court is reversed.
REVERSED

. As to Mr. Teter, Apollo Marine asserted he was negligent in the following five non-exclusive respects: (i) failing to follow appropriate procedures in unloading the spool of rope from the truck; (ii) failing to obtain assistance in unloading the spool of rope from the truck; (iii) failing to procure and use the proper equipment in unloading the spool from the truck; (iv) failing to act as a reasonably prudent person would have acted under the circumstances; and (v) failing to avoid and guard himself against ordinary, open and obvious risks.
As to American Bridge, Apollo Marine asserted it was negligent in the following three non-exclusive respects: (i) failing to follow established procedures in unloading the spool of rope from the truck; (ii) failing to provide Mr. Teter with the appropriate equipment to unload the spool of rope from the truck; and (iii) failing to provide Mr. Teter with assistance in unloading the spool of rope from the truck.

. Mrs. Teter also introduced medical records. In the trial court, Apollo Marine contended that the medical records should be stricken because the records were not verified and thus were not competent evidence for purposes of summary judgment. The trial court apparently never ruled on the request to strike the medical records. We find it unnecessary to address this issue on appeal.