Sharon S. DUPRE, et al.

v.

CHEVRON U.S.A. INC., et al.

Civil A. No. 91–4250.

United States District Court, E.D. Louisiana.

Jan. 29, 1996.

Harvey Jay Lewis, Douglass V. Freret, II, Lewis & Kullman, New Orleans, LA, and E. Bragg Williams, III, Williams, Williams & Montgomery, Poplarville, MS, for plaintiff.

Michelle A. Bourque Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, LA, George Burton Jurgens, III, Nesser, King & LeBlanc, New Orleans, LA, Michael H. Bagot, Jr., Whitney L. Cole, Wagner, Bagot & Gleason, New Orleans, LA, Gerard T. Gelpi, Stephanie D. Skinner, Gelpi, Sullivan, Carroll & Gibbens, New Orleans, LA, James D. Wise, Jr., and William A. Galerston, Brown, Sims, Wise & White, Houston, TX, for defendants.

## *ORDER*

VANCE, District Judge.

This matter is before the Court on the summary judgment motion of defendant, Chevron U.S.A. Inc. ("Chevron"). The mo-

tion is **GRANTED** for the reasons that follow.

## I. *FACTUAL HISTORY*

Plaintiff, Sharon S. Dupre, individually and as natural tutrix of her minor child, Beau Nicholas Dupre, filed suit against Chevron and I.M.I. Engineering Company to recover damages resulting from the death of her husband, Russell Dupre.[1] Russell Dupre was killed on May 10, 1991, while working as a driller for Sundowner Offshore Services, Inc. ("Sundowner") off the coast of Louisiana on the Outer Continental Shelf.

Chevron is the owner and operator of an offshore fixed oil and gas platform designated as South Timbalier 35–D ("35–D"). On April 5, 1991, Sundowner entered into a contract with Chevron to perform workover drilling operations through the use of the Sundowner V Drilling Rig (the "rig") on Chevron's 35–D platform. Sundowner then submitted a schematic showing the proposed location of the rig on the 35–D platform. (Plaintiffs' Ex. A. at 26 and Ex. B.) Chevron approved the location, and the rig was installed in accordance with Sundowner's schematic on April 10, 1991. (Plaintiffs' Ex. A. at 30; Defendants' Ex. 2 at ¶¶ 10–11.)

The workover drilling work was performed by a Sundowner crew consisting of Russell Dupre, a driller; Johnny Walker, a derrick hand; Barry Fry, a toolpusher; as well as other Sundowner employees. The activities of the Sundowner drilling crew were under the direct supervision of Barry Fry. When Fry was not present, Russell Dupre was in charge of the drilling operation. All of the day-to-day tasks on the rig were performed by Sundowner employees. Although a Chevron company representative, Jeff Sanchez, was present on the 35–D platform during the drilling operations, Sanchez did not give any orders or directions to the Sundowner crew regarding the workover drilling operations.

At the beginning of Russell Dupre's workday on May 10, 1991, the Sundowner crew noticed that the rig's traction motor was smoking. Russell Dupre shut down the drilling operation and discussed the problem with his supervisor, Barry Fry. Fry instructed Russell Dupre and a co-worker, Johnny Walker, to inspect the traction motor and attempt to clear the brushes inside the motor. To gain greater access to the brushes, Fry told Russell Dupre to remove the blower motor, which was mounted on top of the traction motor. The skid where the traction motor was located was only about five feet off the floor of the rig, but a portion of it was hanging over the edge of the 35–D platform, approximately eighty feet over the Gulf of Mexico.

Russell Dupre and Walker climbed onto the skid to inspect the motors. Walker wore a safety belt because he was located on the portion hanging over the Gulf. Russell Dupre was not wearing a safety belt; he was located on the inside portion of the skid, with the traction motor between him and the perimeter overhanging the Gulf. The two men worked to get the blower motor free, but because it had been painted together with the traction motor, it would not come free. Russell Dupre and Walker then decided to rock the blower motor back and forth to loosen it. As the paint seal broke, the blower motor fell outward, and Russell Dupre flipped over the traction motor, falling tragically to his death into the sea.

## II. *PROCEDURAL HISTORY*

On May 3, 1993, the Honorable Peter Beer of this Court granted summary judgment to Chevron based on a lack of evidence of vicarious liability on the part of Chevron for the actions of Sundowner, its independent contractor. Minute Entry entered May 3, 1993 at 5. However, a divided panel of the Fifth Circuit vacated the order and remanded on the ground that Chevron may be independently liable for negligence leading to the death of Russell Dupre. *Dupre v. Chevron U.S.A., Inc.,* 20 F.3d 154, 158 (5th Cir.1994), *reh'g and reh'g en banc denied,* 33 F.3d 7 (5th Cir.1994).

The Fifth Circuit initially stated that plaintiff alleged negligence under La.Civ.Code art. 2315 and that "[o]n the facts presented in this case, we find that a duty existed." *Id.*

1. I.M.I. was granted summary judgment on November 19, 1992 on the grounds that it did not design, manufacture, operate or own the Sundowner V drilling rig.

at 157. The court went on to say that "[u]nlike the typical vicarious liability case in which the independent contractor created the danger, in this case Chevron specifically authorized any hazardous situation created when it expressly approved the plan submitted by Sundowner for the installation and set-up of its rig." *Id.* at 158. The court held that "Chevron had [a] duty to take reasonable steps to make and keep its platform safe for workers thereon. This duty included areas of its platform altered or modified with its knowledge and approval." *Id.* The court remanded to decide the factual issue of whether Chevron breached that duty.

Chevron then petitioned for a rehearing or, alternatively, a rehearing *en banc.* Although the petition was denied, the panel issued a second opinion in denying rehearing. *Dupre,* 33 F.3d 7. In it, the court retreated from its earlier holding that Chevron had an independent duty to Russell Dupre. The court stated that:

> The trial court did not decide whether Chevron owed a duty. Nor do we now. We vacated and remanded so that the trial court may determine whether, under the facts of this case, Chevron owed plaintiff a duty, separate from vicarious liability, after affording counsel an opportunity to develop all the facts and to make their argument, by further summary proceedings, or trial, as the district court may decide.

*Id.* at 8. The matter is now before this Court on Chevron's motion for summary judgment on the issue of whether it owed a duty of reasonable care to Russell Dupre.[2] The issues have been ably briefed and argued by both sides. The Court has carefully reviewed the factual record and the relevant case law and resolves this issue as follows.

## III. DISCUSSION

■ Chevron alleges that it owed no duty of due care to Russell Dupre. In response, plaintiff argues that Chevron had (1) a duty to provide even its contract employees a reasonably safe place to work and (2) that it assumed a duty of due care by undertaking safety inspections of the rig. (Mem.Opp. Chevron's Mot.Summ.J. at 3.) Plaintiff argues that Chevron breached the duty to her husband because:

> (1) Chevron negligently authorized Sundowner, the drilling contractor to erect its drilling rig on Chevron's OCS [Outer Continental Shelf] platform in an unsafe location; which created an unreasonably dangerous condition and constituted a "recognized hazard" in violation of federal law; and
>
> .(2) Chevron negligently failed to inspect the Sundowner drilling rig due to noncompliance with established company policy and, as a consequence, Chevron failed to recognize and require correction of this hazardous condition as was its duty under applicable law.

(*Id.*) Whether a duty is owed is a matter of law, but whether the defendant breached that duty is a question of fact. *Mundy v. Dept. of Health and Human Resources,* 620 So.2d 811, 813 (La.1993). Louisiana state law is applicable here.[3]

### A. Duty to Provide a Reasonably Safe Place to Work

Plaintiff alleges that Chevron has a duty to provide a reasonably safe place to work not only for its own employees, but also for the employees of its independent contractor. She also asserts that Chevron acquired such a duty because it "affirmatively created the hazard which caused Mr. Dupre's death." (Plaintiff's Response to Chevron's Reply Mem. at 1.) The Court will address these arguments in turn.

#### 1. Duty of Reasonable Care to Persons on the Premises

■ Plaintiff cites authority for the general proposition that "the owner or operator of a facility has the duty of exercising reasonable care for the safety of persons on

---

2. In light of the statements in the panel's opinion denying rehearing, the Court will not rely on the holding of the first *Dupre* opinion on the issue of whether Chevron has a duty.

3. The Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331, *et seq.,* extends the law of the adjacent state, in this case Louisiana, to actions arising from injuries on platforms on Outer Continental Shelf platforms.

his premises and the duty of not exposing such persons to unreasonable risks of injury or harm." *Mundy*, 620 So.2d at 813; *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 239 (5th Cir.1983). She argues that "[t]his duty extends to employees of independent contractors, for whom the owner must take reasonable steps to ensure a safe working environment." *Citing Donavan v. Jones*, 658 So.2d 755, 764 (La.App.2d Cir.1995).[4] Because the 35–D platform is owned and operated by Chevron, plaintiff argues that Chevron had a duty of reasonable care to her husband.

Plaintiff must first show that the accident occurred on Chevron's premises before the duty she asserts can be triggered. The Court finds as a matter of law that the drilling rig was not Chevron's premises.

A number of cases have involved whether attachments to oil and gas platforms should be considered appurtenances for the purposes of La.Civ.Code art. 2322, the strict liability statute applicable to "damage caused by ruin of a building." *See Knapp v. Chevron U.S.A., Inc.*, 781 F.2d 1123, 1127 (5th Cir.1986); *Steele v. Helmerich & Payne Int'l Drilling Co.*, 738 F.2d 703, 706 (5th Cir.1984); *Boggs v. Atlantic Richfield Co.*, 720 F.Supp. 72, 75 (E.D.La.1989); *Sistrunk v. Conoco, Inc.*, 693 F.Supp. 498, 499–500 (E.D.La.1988). Although this action involves allegations of negligence, not strict liability under Article 2322, the Court finds that this line of cases is the most instructive for determining whether the rig and the skid on which the traction motor rested should be considered an appurtenance to the 35–D platform and therefore a part of Chevron's premises.

Under Article 2322, there are two general considerations in determining if an attachment qualifies as an appurtenance: (1) how securely the addition is attached to the platform; and (2) the degree of permanence the parties intend for the addition. *Knapp*, 781 F.2d at 1127; *Steele*, 738 F.2d at 705; *Sistrunk*, 693 F.Supp. at 499–500. An additional factor is furnished by La.Civ.Code art. 466, which states: "Things are considered perma-

nently attached if they cannot be removed without permanent damage to themselves or to the immovable to which they are attached." *Steele*, 738 F.2d at 706; *Boggs*, 720 F.Supp. at 75 (holding that Article 466 should be the sole test); *Sistrunk v. Conoco, Inc.*, 693 F.Supp. at 500 (holding that Article 466 is a factor to be considered in determining whether an attachment is an appurtenance).

The Court notes that prior to the passage of Article 466, the Louisiana Supreme Court found that a drilling rig and a modular living unit on the rig were appurtenances of a drilling platform. *Olsen v. Shell Oil Co.*, 365 So.2d 1285, 1289 (La.1978); *see also Axon v. Noble Drilling Co.*, 769 F.Supp. 960, 962 n. 3 (E.D.La.1991) (stating in *dicta* that drilling rigs were appurtenant to the platform, but failing to consider Article 466). However, Article 466, which the Fifth Circuit has recognized as a factor to consider, did not go into effect until the year after the *Olsen* decision. Because the Louisiana Civil Code now specifically defines what constitutes a "permanent attachment" for the purposes of identifying appurtenances, the Court must look to the Code as opposed to the "prior jurisprudentially-developed" concept of appurtenance in *Olsen* for guidance. *Boggs*, 720 F.Supp. at 75; *see also* La.Civ.Code art. 2 (in civil law jurisdictions, legislation is superior to any other source of law). The Court now turns to that inquiry.

It is undisputed that the rig "is easily removable from a platform when it completes drilling operations thereon. It was never intended or contemplated that the [rig] would be permanently attached to Chevron's 35–D platform and in fact, it was not." (Statement of Uncontested Material Facts at ¶ 50; Response to Chevron's Statement of Uncontested Material Facts at ¶ 10.) In addition, the rig was removed from another platform to be placed on the 35–D platform and was moved again after workover drilling operations were completed on the 35–D platform. With the consistent reuse of the rig, it is obvious that it suffered no permanent damage from its attachment to the various

---

4. *Donavan* is questionable precedent. The *Donavan* court relied on the first *Dupre* decision for the cited proposition, but the precedential value of the decision is undermined by the *Dupre* panel's retreat from its original opinion.

platforms. Nor is there any indication that the platform was damaged when the rig was removed. *See Boggs,* 720 F.Supp. at 75 (holding that since drilling rig could be and was removed from platform without permanent damage to it or the platform, it could not be deemed an appurtenance). Consequently, the Court finds that the rig and the area surrounding the traction motor do not qualify as appurtenances to the 35–D platform and therefore, were not Chevron's "premises" for the purposes of determining the scope of its duties.

### 2. *Whether Chevron Acquired A Duty from Its Approval of Sundowner's Placement of the Rig*

■ Plaintiff further argues that Chevron has a duty because it affirmatively created the hazard which caused Russell Dupre's death by allowing the drilling rig to be "installed with the traction motor projecting over the outer perimeter of the platform, with no protective railing or other type of fall protection provided to workers performing maintenance on the traction motor." (Plaintiff's Response to Chevron's Reply Mem. at 1.) The Court disagrees.

Sundowner's rig was a self-contained work site, which included a galley, office, sleeping quarters, laundry, as well as its own electrical power, water and sewerage system. (Statement of Uncontested Material Facts at ¶ 22; Plaintiffs' Response to Chevron's Statement of Uncontested Material Facts at ¶ 9.) It is undisputed that Sundowner employees designed the rig and the area where the traction motor was housed. It is also undisputed that the rig was placed on the location specified by Sundowner and that it was not uncommon for Sundowner to place part of the rig at the edge of the platform or even extending over the edge of the platform as was done here. (Defendant's Ex. 1, Aff. of James E. Armstrong at ¶¶ 8–11.) Chevron merely approved Sundowner's schematic on the location; Sundowner, not Chevron, placed the rig at the edge of the platform.

The Court's review of the factual record here indicates that Chevron's approval of the rig location plan did not rise to the significance nor warrant the consequences urged by the plaintiff. The evidence does not suggest that Chevron's approval of the schematic showing the rig's location amounted to a safety evaluation of the components of the rig. Mr. Doublin of Chevron testified that the purpose of Chevron's review of the schematic was to make sure that Chevron's helipad was accessible after the rig was in place and that the platform could withstand the loads imposed by Sundowner's rig. (*See* Defendant's Ex. 10, Doublin depo. at 28–29.) Plaintiff's contention that Chevron reviewed and approved the rig set-up in order to assure safe conditions for the drilling crew is not supported by the record citation plaintiff relies on. (*See* Plaintiff's Ex. A, Doublin depo. at 63–64.) Mr. Doublin was the person who approved the schematic and he testified directly as follows:

Q. Now, why would Sundowner take and prepare a drawing that shows the physical location, proposed physical location of the drilling rig and send it back to Chevron, what's the purpose of that step?

A. Well, I do two things with it. One, I inspect it to make sure, to make certain things like the helideck are still accessible. And then in most cases I will have somebody in our structural group look at the loads. They will put a weight on each of these components and see how it loads the structure.

Q. Why do you want that done or feel that you need that done, have the Chevron department become involved in load measurements?

A. Just to be sure that the platform is in condition to handle the load of this rig and the load that's being posed on it by handling the drill pipe and the work that we have to do.

Q. And then did you do that in this case?

A. Yes.

Q. What other steps did you take or did Chevron take before passing on and approving the location of the Sundowner rig on your platform?

A. We made certain that the rig could skid from this position to the position over well D–12, I believe it was. And I think that we had asked them to be able to access some other wells on the structure,

although we didn't have firm plans to work on them at that time.

(Defendant's Ex. 10, Doublin depo. at 28–29.) Plaintiff relies on other testimony which plaintiff claims shows that the review of the installation plan was to assure the safety of the contractor's crew. *See* Plaintiff's Ex. A at 63–64. However, that testimony does not refer to the process of approving the installation schematic, but to adoption of a provision in the contract between Chevron and Sundowner that provides as follows:

### Section III

#### Equipment, Material and Supplies

(1) CONTRACTOR shall furnish at its own expense under this agreement:

> Complete workover unit as specified in Exhibit "B" with all the tools, machinery, equipment and appurtenances as stipulated in Exhibit "B" attached hereto and personnel as per Exhibit "C."

It being understood that the enumeration above of specific items of rig supplies and appurtenances to be furnished by CONTRACTOR shall not be deemed to relieve CONTRACTOR from furnishing at its own expense such other items as may be required for diligent, skillful and workmanlike performance. Moreover, OPERATOR shall have the right, *but not the duty*, to inspect and reject for cause any machinery, equipment, tools, appliances, materials, supplies, or instruments furnished by CONTRACTOR, and CONTRACTOR shall be required to replace any rejected equipment or material with equipment or material acceptable to OPERATOR. The acceptance or rejection, or failure to accept or reject, any item shall neither diminish the warranty or liability of CONTRAC-

TOR nor enlarge the liability or responsibility of OPERATOR.

(Defendant's Ex. 1 at Ex. A, at 2 (emphasis added).) It is true that Mr. Doublin testified that the reason Chevron wanted to have this contract provision regarding the right to inspect and reject machinery and equipment was so that the contractor's equipment would not jeopardize Chevron's well or be unsafe to personnel (*see* Plaintiff's Ex. A at 63–64). However, Mr. Doublin did not testify that Chevron's review of the rig installation schematic was a safety evaluation. Rather, he made very clear what he did in reviewing the schematic and why he did it. The evidence of Chevron's actions and purposes in reviewing the installation plan is simply not of the character to warrant a finding that it assumed a duty to be responsible for the safety of all of the component parts of Sundowner's rig. Further, while the drawing Chevron approved showed the rig overhanging the edge of the platform, this was not per se dangerous. It was undisputed that this was not an uncommon industry practice. Even plaintiff's expert concedes "[i]t is customary and in no way unusual for parts of the rig to be so positioned that there are areas of the rig which extend well beyond the outer perimeter of the platform deck as is the case here." (Plaintiff's Ex. K, Aff. of John L. Pfeffer.[5]) It cannot be said that Doublin's conduct in approving the installation plan created the hazard that caused plaintiff's death.

■ Further, the quoted contract provision about which Mr. Doublin testified made clear that it was not intended to impose a duty on Chevron with respect to the contractor's equipment, material and supplies and that, as between the contractor and the oper-

---

**5.** Although plaintiff's expert claims there was a wind-loading dimensions drawing that indicated that there was no guardrail on the motor end of the skid, there is no evidence in the summary judgment record that the drawing referred to by the expert was in fact reviewed by Chevron in connection with its approval of the installation schematic. Although the expert claims that these drawings were furnished to Chevron to be reviewed in this process, the expert does not give the basis for his statement, which is obviously made without personal knowledge. Rather, both parties cite Exhibit "B" to the contract as the

schematic Chevron approved in approving the rig location. (*See* Defendant's Ex. 2 at ex. B; Plaintiff's Ex. B (schematic).) While this schematic depicted the traction motor at the perimeter of the platform, there is no evidence that this schematic was of such detail that items such as guardrails would have been depicted. *See id.* Nor does the schematic indicate anything about where the access panels to the motor were located. All the schematic revealed was that the installation was proposed to be at the perimeter of the platform.

ator, the provision did not enlarge Chevron's liabilities to any extent. Indeed, the contract provided that Sundowner "shall remain in complete control of all operations and all personnel engaged by it hereunder at all times." (Defendant's Ex. 1, at ex. A, Contract at Section I.) The contract further provided that Sundowner was responsible for the safety of its personnel. (*Id.* at Section IV.) Further, installation of the rig was likewise Sundowner's responsibility.

The Fifth Circuit has found that courts may rely on the contract terms between the parties to determine the existence and scope of the duties owed. *See Graham v. Amoco Oil Co.*, 21 F.3d 643, 647 (5th Cir.1994); *see also Crane v. Exxon Corp.*, 613 So.2d 214, 221 (La.App. 1st Cir.1992) (finding under contract that platform owner owed no duty to provide safe place for work to independent contractor). In *Graham,* plaintiff argued, as plaintiff does here, that Amoco was liable for independent acts of negligence by creating an unsafe workplace. Plaintiff also argued that Amoco was independently negligent because its "company man" observed that the independent contractor used procedures in unloading pipe that violated Amoco's safety manual and failed to correct them. The court rejected the argument that Amoco owed the contractor's employee a duty to provide a safe workplace by referring to the contractual allocation of responsibilities between the contractor and Amoco:

> The plaintiffs' argument principally concerns the duty, if any, that Amoco owed to Graham. Duty is a question of law [citation omitted]. In *Crane v. Exxon Corp.,* 613 So.2d 214, 221 & n. 7 (La.Ct.App.1992), the Louisiana court defined the principal's duty by reference to its contract with the independent contractor. The Louisiana court held that, under the contract, the principal had no duty to provide a safe workplace to the independent contractor's employees. *Id.* ... In the instant case, Amoco's duties were expressly delineated in its contract with Dual. Amoco had the duty to deliver suitable casing, but did not have any duty whatsoever with respect to the working conditions or procedures of the Dual employee—Graham—who was injured as he was supervised by another

Dual employee—Riley—while each were performing activities that the contract expressly delegated to Dual.

21 F.3d at 647.

The court further rejected the argument that Amoco had assumed a duty to provide a safe workplace by its conduct because the contract placed all of the responsibility for the activity at issue on the contractor. *Id.* Cases such as *Graham* implicitly recognize the propriety of honoring the parties' legitimate expectations about the limits of their exposure as reflected by their contracts, absent some strong indication that they acted inconsistently with their agreed allocation of risk.

The *Graham* court also rejected reliance on Amoco's safety manual as a source of a duty because the contract did not incorporate the manual, and it placed the obligation to observe safe work practices on the contractor. *Id.* Similarly, the contract in this case made clear that the contractor was responsible for the safety of the workplace:

### Section IV

#### Conduct of Operations

> CONTRACTOR will conduct its operations in such a *manner that safety of all personnel on the drilling location is a primary operating principle.* The CONTRACTOR'S operating procedures will *be directed to maintaining a workplace that eliminates personal injury,* equipment damage and downtime, and damage to the environment. Operating procedures not covered by specific legal regulations will be conducted in accordance with standard industry practice, as contained in the publications of the International Association of Drilling Contractors, the American Petroleum Institute, or as otherwise specified by the OPERATOR in its drilling programs and similar written documents.

(Defendant's Ex. 1 at ex. A, p. 2 (emphasis added).) Indeed, the contract specifically stated that neither Chevron's liability nor its responsibility would be increased as a result of its right to reject equipment, tools, supplies and machinery. *Id.* Further, it is undisputed that the contractor was responsible

for the repair and maintenance of its equipment, such as the traction motor and blower involved here. (*See* Defendant's Ex. 1, Armstrong Aff. at ¶¶ 13, 15.)

█ Plaintiff also argues that Chevron violated federal regulations promulgated by the Department of Interior's Minerals Management Service ("MMS") regarding safety on oil and gas platforms on the Outer Continental Shelf. Specifically, plaintiff relies on 33 C.F.R. § 142.4(a), which provides:

> Each holder of a lease or permit under the Act shall insure that all places of employment within the lease area or within the area covered by the permit on the OCS are maintained in compliance with workplace safety and health regulations of this part and, in addition, free from recognized hazards.

and 33 C.F.R. § 143.110(a), which provides in part:

> Except for helicopter landing decks which are provided for in paragraph (b) of this section, and areas not normally occupied, the unprotected perimeter of all floor or deck areas and openings shall be rimmed with guards and rails or wire mesh fence.

Plaintiff asserts that the Fifth Circuit has condoned the use of federal regulations "to define the scope of the platform owner's duty of care." (Plaintiff's Opp.Mem. at 20.) However, while MMS regulations may be used as evidence in weighing a defendant's culpability, the Fifth Circuit has held that "there is no implied cause of action from the mere breach of MMS regulations." *Romero v. Mobil Exploration and Producing N.A., Inc.,* 939 F.2d 307, 311 (5th Cir.1991). These regulations alone simply do not provide a basis for recovery. *Id.* at 309, 311.

Under the circumstances presented here, the regulations in issue did not create a duty on the part of Chevron to maintain a safe workplace for Mr. Dupre and its contractor's other personnel. As noted earlier, the contract between Chevron and Sundowner obligated Sundowner to maintain a safe work-place and to conduct its operations consistent with legal regulations and standard industry practices. (*See* Defendant's Ex. 1 at Ex. A, p. 2, Section IV.) Moreover, the MMS regulations provide that "persons responsible for actual operations, including ... contractors ..., shall insure that those operations subject to their control are conducted in compliance with workplace safety and health regulations of this part and, in addition are free from recognized hazards." 33 C.F.R. § 142.4(b). To the extent that plaintiff argues that MMS regulations required that the area around Sundowner's traction motor be protected with guardrails, it is clear that Chevron's contract allocated that responsibility to Sundowner when it charged it with complying with applicable legal regulations in its sphere of operations. Further, the MMS regulations likewise impose such an obligation on Sundowner for the activities under its control. *Id.* Here, the motor was Sundowner's equipment, was located on its rig, and if guardrails were in fact required by the regulations, this would be an area under Sundowner's control.[6] Under these circumstances, the MMS regulations do not require a finding that Chevron owed a tort duty to the plaintiff's decedent.

**B. *Acquired Duty to Provide Reasonable Safety Inspections***

█ Finally, plaintiff argues that Chevron acquired a duty of reasonable care as to Russell Dupre by creating a "comprehensive" safety inspection program that "involves examining its contractor's work place, procedures and equipment for safety concerns." (Mem.Opp. Chevron's Mot.Summ.J. at 23.) "If a person undertakes a task which he has no duty to perform, he must perform the task in a reasonable and prudent manner." *Crane,* 613 So.2d at 221. Plaintiff argues that Chevron's personnel negligently failed to recognize and correct an obvious hazard consisting of the unprotected traction motor, which they should have known required maintenance. However, the evidence fails to

---

6. The Court notes that it is not at all clear that the handrail regulation even applies here since it requires rails or guards around areas "not normally occupied." It is questionable whether the motor was in an area that could be considered "normally occupied" simply because it required periodic maintenance. However, it is unnecessary to resolve this issue for the purposes of this decision.

support plaintiff's contention. The Court finds that Chevron's actions did not trigger a duty of due care.

Plaintiff relies heavily on the Louisiana Court of Appeals' holding in *Crane*. In that case, the oil company's representative went beyond his duties as the company's contact with the independent contractor, which was to ensure compliance with the job specifications. The representative personally reprimanded members of the contractor's crew for safety violations. *Crane*, 613 So.2d at 221. The court found that such behavior demonstrated that the oil company representative voluntarily assumed the task of monitoring safety violations.[7] Here, however, while Chevron used a Drilling Inspection Checklist, the Checklist makes clear that safety on the rig was the ultimate responsibility of Sundowner.

> It is understood that compliance with all applicable legal requirements and the safe conduct of all drilling operations are and remain the responsibility of any contractor executing a drilling contract or operation for Chevron. Chevron's maintenance and use of the above and foregoing checklist procedure shall in no manner whatsoever modify, waive, or alleviate the duties and obligations of contractor or modify or enhance Chevron's duties or responsibilities with respect thereto whether under contract or by law or otherwise.

(Defendant's Ex. 13, Drilling Inspection Checklist.) Further, the contract between Chevron and Sundowner imposed no contractual duties on Chevron to make safety inspections. *See Graham, supra*, 21 F.3d at 647 (operator's safety manual not source of duty where not incorporated in contract and contract made contractor responsible for safety).

Moreover, the Fifth Circuit contrasted the company representative's behavior in *Crane* with the behavior of the representative in *Graham* in which the representative "did not affirmatively assume any responsibilities sim-

ply by observing their unsafe work habits." *Graham*, 21 F.3d at 647. In the instant case, it is undisputed that Chevron's company representative did not instruct Sundowner's personnel on the method to maintain or repair the traction motor, which was Sundowner's responsibility. Indeed, no Chevron employee was present on the scene when Mr. Dupre attempted the repair. Further, Chevron's checklist does not require inspection of the traction motor, its inspector did not inspect it, and he did not know how the drill crew members maintained it. (Defendant's Ex. 16, Maurice Gourrier Depo. at 100–03, 122–23, 125.) While plaintiff argues that Chevron's inspector acknowledged that the location of the motor was a "recognized hazard," the inspector simply said "yes" in response to a hypothetical question from plaintiff's counsel that "*if* the routine maintenance required someone to get on top of that unit ... would you think that that would constitute a recognized hazard." (Plaintiff's Ex. I, Gourrier depo. at 101 (emphasis added).) This testimony does not establish any duty on Chevron's part to have informed itself of Sundowner's maintenance practices or to add inspection of the tractor motor to its checklist.

Although plaintiff argues that Chevron's policies and procedures required Chevron's company man to conduct safety inspections of the rig, this fact does not trigger a duty under these circumstances. The Fifth Circuit has found that a manual put out by the platform owner that (1) outlined safety procedures that a contractor must follow, (2) stated that the owner must conduct safety inspections prior to the issuance of a safe work permit, and (3) required the owner to conduct inspections of the area, did not give the platform owner a duty to the independent contractor. *LeJeune v. Shell Oil Co.*, 950 F.2d 267, 269 (5th Cir.1992). Considering that the Drilling Inspection Checklist makes clear that Sundowner retains responsibility for safety on its rig, Chevron's policy

---

**7.** While plaintiff argues that Chevron's inspectors reprimanded the drilling contractor, albeit for unrelated matters, the record reveals that the inspectors had not even inspected the rig on the 35–D platform before Mr. Dupre's death. Therefore, they could not have reprimanded Sundown-

er's crew on this job in the time period relevant to plaintiffs' motion. (*See* Defendants' Ex. I, Gourrier depo. at 70; Defendant's Ex. M, depo. of Brian Weatherl at 20; Plaintiff's Opposition Memo. at 11.)

on inspections in no way triggered a duty of due care.

In addition, the record demonstrates that Sundowner did not shirk its safety responsibility in reliance on any action by Chevron. Among the Sundowner supervisor's responsibilities was to conduct a "safety planning meeting prior to performing each non-routine task." (Defendant's Ex. 11, Toolpusher's Safety Responsibilities.) The record reflects that Barry Fry, the Sundowner supervisor, had a meeting with Russell Dupre and Johnny Walker prior to their attempt to repair the traction motor. Finally, it is undisputed that Chevron's company representative had no role in the repair or inspection of the traction motor. Given that Chevron did not take over the safety operations for the rig, the Court finds that it had no independent duty of due care to Russell Dupre.

In addressing plaintiff's claim that Chevron had an independent duty of due care, the Court cannot ignore the substantial body of case law dealing with related issues under vicarious liability law. Indeed, in this case, the Court sees no practical difference between plaintiff's claim that Chevron acquired a duty by virtue of involving itself with safety and those cases in which the Fifth Circuit analyzed whether the platform owner's knowledge of risks or role in safety operations created a duty so that it could be vicariously liable for the negligence of its independent contractor. In the latter cases, the Court examined whether the principal "retained or exercised operational control" of the safety procedures on the contractor's rig in order to determine if a duty was owed. *Ainsworth v. Shell Offshore, Inc.*, 829 F.2d 548, 550 (5th Cir.1987), *cert. denied*, 485 U.S. 1034, 108 S.Ct. 1593, 99 L.Ed.2d 908 (1988); *see also Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 192–93 (5th Cir.1991); *Zepherin v. Conoco Oil Co., Inc.*, 884 F.2d 212, 213 (5th Cir.1989); *Boutwell v. Chevron U.S.A., Inc.*, 864 F.2d 406, 408 (5th Cir.1989). To create a duty based on plaintiff's claim that Chevron "examin[ed] its contractor's work place, procedures and equipment for safety concerns" would amount to an end-run around a large body of Fifth Circuit precedent finding no "operational control" despite some knowl-

edge of risk or involvement with safety issues and the presence of "company men" on the contractor's rig. *See, e.g., Duplantis,* 948 F.2d at 193 (no duty despite holding safety meetings and having role in firing of contractor employee for safety violations); *Boutwell,* 864 F.2d at 408 (no duty to stop contractor from working around hole in deck); *Ainsworth,* 829 F.2d at 551 (no duty despite company man's knowledge that contractor was working without lights). As the *Duplantis* court held, "[t]he fact that a principal takes an active interest in the safety of the employees of its independent contractor does not, in and of itself, constitute direct operational control." *Duplantis,* 948 F.2d at 193. Even though couched in the language of vicarious liability, these decisions would be difficult to reconcile with a finding of an independent duty on the part of Chevron on the facts presented here. Accordingly,

IT IS ORDERED that Chevron's motion for summary judgment is hereby **GRANTED.**