717 So.2d 1194 (1998)
Nestor ABUAN, as guardian on Behalf of Carlos VALDEZ
v.
SMEDVIG TANKSHIPS, LTD., et al.
No. 96-CA-1013.
Court of Appeal of Louisiana, Fourth Circuit.
June 24, 1998.
Rehearing Denied September 15, 1998.
*1196 Richard J. Dodson, David C. Vidrine, Kenneth H. Hooks, III, Dodson & Vidrine, APLC, Baton Rouge, and A.N. Yiannopoulos, Professor, Eason Weinmann Center for Comparative Law, Tulane University, New Orleans, and Symeon Symeonides, Professor of Law, Baton Rouge, and B.K. Agnihotri, Chancellor and Professor of Law, Southern University, Law Center, Baton Rouge, for Plaintiff/Appellee Nestor Abuan, as guardian on Behalf of Carlos Valdez.
David B. Lawton, L.R. DeBuys, IV, Terriberry, Carroll & Yancey, New Orleans, for Defendants/Appellants Smedvig Tankships, Ltd., et al.
Before SCHOTT, C.J., and BARRY, KLEES, LANDRIEU and MURRAY, JJ.
MURRAY, Judge.
The defendants, Smedvig Tankships, Ltd., Smedvig Tankships (Agencies), Ltd., Smedvig Tankships Management, Ltd., Smedvig Tankships, A.S., a/d/a Smedvig Tankrederi A.S., Peder Smedvig, A.S., Peder Smedvig Singapore, Ptd., Ltd., K.S. Smedvig Tankers V, and K.S. Smedvig Tankers VI, (hereafter referred to as the Smedvig group) appeal a judgment in favor of plaintiff, Carlos Valdez[1], in the amount of $5,042,563.00, plus costs and interest. We reverse in part and affirm in part.
Carlos Valdez signed on board the M/T Vestri on March 27, 1993, at Philadelphia, Pennsylvania. Mr. Valdez, who was hired as an engine room cadet, was injured on May 26, 1993, when the engine room crane collapsed and a piston fell on him. This incident occurred in international waters approximately 84 miles off the coast of Florida while the Vestri was on a voyage between Houston, Texas and Philadelphia, Pennsylvania. Mr. Valdez was flown to a hospital in Key West, Florida where he was diagnosed with multiple significant traumas, and two serious leg fractures. On May 27, 1993, Mr. Valdez fell into a coma, lasting nearly a month, which was caused by a fat embolism related to the fractures he sustained while on the Vestri. He was hospitalized until July 2, 1993, when he was transferred to a rehabilitation hospital and ultimately to a community re-entry center. Mr. Valdez was discharged from the latter facility, and lived with friends in Miami until being admitted to the Rehabilitation Living Center in New Orleans.
On August 22, 1994, this action was brought on Mr. Valdez' behalf in the district court in Plaquemines Parish, pursuant to the "Savings-to-Suitors" clause, 28 U.S.C. § 1333. The plaintiff asserted jurisdiction over the defendants by virtue of an in rem arrest or attachment of a vessel owned by the defendants while it was physically located in Plaquemines Parish.[2] The petition sought *1197 relief under the Jones Act, the General Maritime Law, and alternatively under the law of either the Philippines or Norway, which Mr. Valdez alleged to be the same as that of the United States.
The defendants filed declinatory and peremptory exceptions and a motion to dismiss based on a forum selection clause in Mr. Valdez' contract of employment with the agent for Peder Smedvig Singapore PTE, Ltd. (hereafter referred to as the overseas employment contract). The exceptions and motion were denied. Defendants appealed the trial court's refusal to enforce the forum selection clause, and Mr. Valdez moved to dismiss that appeal. This court denied the motion, but converted the appeal to an application for supervisory writ when the Supreme Court ruled that it was error to have denied the dismissal. The trial, which had been rescheduled for its original setting after the defendants' appeal was dismissed, was stayed by this court pending its consideration of the writ application. The writ application was denied, with one dissent.[3]
Following a three day bench trial in September, the trial court entered judgment in favor of Mr. Valdez, and assigned reasons for that judgment. The defendants timely appealed, arguing that the trial court erred by refusing to enforce the forum selection clause and by its application of United States law to Mr. Valdez' claims. The defendants also argued that the damages awarded were excessive and erroneous as a matter of law. The appeal was argued, and then reargued before a 5-judge panel in accordance with LSA-Const. Art. 5, § 8 B. The parties were allowed to file supplemental briefs following the reargument. In addition, the parties requested and were granted leave to brief the applicability of the Supreme Court's decision in Lejano v. K.S. Bandak, 97-0388 (La.12/12/97), 705 So.2d 158, to this case.

THE FORUM SELECTION CLAUSE:
There is no question that the district court had jurisdiction of Mr. Valdez' claim. The question raised by defendants in their first assignment of error is whether the court should have declined to exercise that jurisdiction and require Mr. Valdez to bring his claim in the Philippines or Norway as provided in the overseas employment contract. The district court found that the forum selection clause contained in the overseas employment contract was not enforceable against Mr. Valdez under the law of the United States, the Philippines, or Norway. The Smedvig group contends that the provisions of this contract, which incorporates the terms and conditions of the "standard employment contract governing the employment of all Filipino seamen on board ocean-going vessels" approved by the Philippine Overseas Employment Administration (POEA), should be enforced.
In Lejano, supra, the Supreme Court considered the enforceability of a forum selection provision that is indistinguishable from the one at issue here. Mr. Lejano was a Philippine seaman who had been seriously injured in international waters on board a vessel owned by a Norwegian corporation. He was treated for an extended period of time in Miami and then repatriated to the Philippines. The trial court had ruled that the forum selection clause in Mr. Lejano's overseas employment contract was enforceable and ordered him to file suit in the Philippines or Norway; and the appellate court denied writs. Lejano v. Bandak, 95-1011 (La.App. 5 Cir. 1/15/97), 688 So.2d 86. Citing conflicting decisions of the state appellate courts, Mr. Lejano petitioned the Supreme Court to grant certiorari in order provide guidance to the lower courts on the issue of forum selection clauses and maritime tort suits. The Court granted the writ. Lejano v. Bandak, 97-0388 (La.4/4/97), 692 So.2d 407.
In his brief on the merits, Mr. Lejano argued that a state court considering an action brought pursuant to the Savings to Suitor's clause must apply federal substantive law, but was free to apply its own procedural law.[4] Justice Johnson, writing for the Court, rejected this argument. The Court determined *1198 that Mr. Lejano's employment contract, which was a contract for the hire of a sailor to man a ship, fell within its admiralty jurisdiction. For this reason, a Louisiana court sitting in admiralty should consider the validity and enforceability of such clauses in accordance with federal law and standards. Lejano, 97-0388 at p. 14, 705 So.2d at 166.
The Court then concluded that, under federal law, "[a] forum selection clause should control absent a strong showing that it should be set aside." Id. at p. 15, 705 So.2d at 167. (Emphasis added, citation omitted.) Because the forum selection clause executed by Mr. Lejano repeated the language in a collective bargaining agreement between The Norwegian Shipping and Offshore Federation ("ASO") and The Associated Marine Officers' and Seaman's Union of the Philippines ("AMOSUP"), of which Mr. Lejano was a member, the Court rejected his argument that he had no power to negotiate the terms of the agreement so that the clause should be declared invalid. Mr. Lejano's claim that he did not understand the language in which the contract was written was determined to be irrelevant in light of the "Philippine employment services' structure, the fact that the POEA [Philippine Overseas Employment Administration] acted on his behalf in negotiating and bargaining for the terms of the contract and the fact that Mr. Lejano signed the POEA-approved contract, thereby submitting to the terms thereof, and consequently, being afforded any benefits and advantages of other provisions of the contract." Id. at p. 18, 705 So.2d at 168.
The Smedvig group argues that Lejano is controlling, and requires a reversal of the trial court's decision and enforcement of the forum selection clause in this case. However, the record contains evidence that clearly distinguishes Mr. Valdez' situation from that of Mr. Lejano. Mr. Valdez, unlike Mr. Lejano, was not a member of (AMOSUP), the Philippine union that was a party to the collective bargaining agreement (hereafter CBA) from which the POEA contract was derived. He was not a veteran seaman. In fact, he had never been to sea before he joined the Vestri in Philadelphia where he executed the shipping articles, his contract of employment with the ship. The CBA between Peder Smedvig Singapore PTE, Ltd. and AMOSUP provides that it will be applicable to Filipino officers who are members of the Union. Mr. Valdez was not an officer, he was a cadet. The CBA provides that cadets are excluded from paying union dues. Unlike the officers to whom the CBA was applicable a cadet received a stipend rather than the compensation paid a regular salaried crewmember. Mr. Valdez was required to execute an affidavit in Manila attesting to his understanding of this difference between the compensation paid him and regular crew members. Attached to the CBA is an appendix which lists the AMOSUP members in the Vestri crew; Carlos Valdez' name does not appear on that list. Mr. Valdez testified that he had no knowledge of any collective bargaining agreement.
These distinctions are material in light of the Supreme Court's reason for enforcing the POEA contract against Mr. Lejano, who was a member of AMOSUP, and who derived the benefits and advantages of other provisions of the union's collective bargaining agreement. As the Supreme Court noted in Lejano, "....according to The Bremen, a forum selection clause should be enforced absent a clear showing that enforcement would be unreasonable and unjust, or that the clause is invalid for such reasons as fraud or overreaching. (emphasis added; citation omitted)." Id. at p. 15, 705 So.2d at 167. The Court determined that the forum selection clause should be enforced as to Mr. Lejano because he was unable to make a clear showing that to do so would be unreasonable, unjust, fraudulent or overreaching. Because Carlos Valdez has shown that enforcement of this provision against him, who was not a member of AMOSUP, who was not aware of the CBA, and who did not receive the compensation paid regular crewmembers would be overreaching, unreasonable and unjust, the trial court correctly found that the forum selection clause was not enforceable under federal law.
The trial court also concluded that neither the law of Norway, nor the Philippines would enforce the forum selection clause under the facts of this case. The record evidence supports that finding.
Plaintiff and defendants introduced affidavits of experts on Philippine law. Plaintiff offered the joint affidavit of Nestor B. Alampay, *1199 Sr., a retired Justice of the Supreme Court of the Philippines, and Ruben F. Balane, Professor of Civil Law at the University of the Philippines, as well as the affidavit of an Assistant Solicitor General of the Republic of the Philippines. Defendants offered the affidavits of Arturo Del Rosario, Jr., a lawyer in the Philippines specializing in maritime and admiralty law; Jaimie P. Gimenez, Director of the POEA; and Roy V. Seneres, Labor Attache of the Government of the Philippines for the United States.
Mr. Del Rosario's affidavit stated his opinion that the POEA has original and exclusive jurisdiction over all cases involving the employer-employee relationship, including claims for money damages, arising out of or by virtue of any law or contract involving Filipino workers for overseas employment. Mr. Gimenez stated that the POEA does exercise jurisdiction in cases of claims for injury or death of Filipino seamen aboard ocean-going vessels pursuant to standardized employment forms and collective bargaining agreements, and that the standardized contract would prevail in cases of conflict between it and the collective bargaining agreement. Mr. Seneres' affidavit was consistent with that of Mr. Gimenez. We note that none of the defense experts addressed the question of whether the overseas employment contract would be enforceable against Mr. Valdez, who was not a member of AMOSUP, and who was not paid union wages.[5]
Justice Alampay and Professor Balane, who stated that the right to seek damages before a competent court of law is a fundamental feature of the admiralty law of the Philippines, opined that the seaman's employment contract could not be interpreted to prohibit his instituting an action for damages. The joint affidavit stated that the POEA has limited itself solely to the determination of rights and obligations of the parties as provided for by the employment contract. The plaintiff's experts noted that Philippine courts have recognized that an employment contract is a contract of adhesion. Finally, the joint affidavit opined that Philippine courts recognize that agreements on venue, commonly known as "forum selection clauses," entered into between the parties to a contract cannot be used to oust a court of jurisdiction when it otherwise has jurisdiction of the case and the parties.
Mr. Edgardo Kilayko, a representative of the official counsel to the government of the Republic of the Philippines, which represents the government in any litigation, proceeding or investigation requiring the services of a lawyer, executed an affidavit attesting that the opinions of Justice Alampay and Professor Balane correctly stated the status of Philippine law.
The trial court, therefore, was presented with conflicting opinions as to the enforceability of the forum selection clause under the circumstances of this case. It chose to credit the evidence offered by plaintiff's experts. Where the testimony of expert witnesses differs, it is the responsibility of the trier of fact to determine which evidence is the most credible. Mistich v. Volkswagen of Germany, Inc., 95-0939, p. 5 (La.1/29/96), 666 So.2d 1073, 1077, reh'g granted, 95-0939 (La.11/25/96), 682 So.2d 239 (original opinion reinstated). Based on the record evidence, we cannot say that the court was manifestly erroneous when it determined that the forum selection clause would not be enforced against Mr. Valdez under Philippine law.
Similarly, plaintiff introduced the affidavit of Oystein Ore, an expert in Norwegian law. In this affidavit, Mr. Ore explained that § 50 of the Norwegian Seaman's Act provided that claims for compensation due a seaman's injury must be raised in the courts of Norway. The reason for this provision was to avoid subjecting Norwegian shipowners to suits outside of Norway, particularly in the United States. In fact, because of this provision Norwegian courts will not recognize forum selection clauses in a seaman's contract of employment. However, Mr. Ore further explained that § 50 was procedural in nature, and, therefore, binding only on Norwegian courts. Mr. Ore stated that Norway recognized *1200 forum selection and choice of law clauses in other types of contracts, but it has required that such provisions be accepted by the parties. Finally, he explained that "accepted," in the context of this case, means that the seaman must have been aware of what was agreed to and accepted the clause. Norwegian law is unlikely to consider the terms in a contract of adhesion as accepted. In considering this question, Norwegian law considers the relative bargaining position of the parties, and "may set aside a contract or any portion thereof if it is considered to be unreasonable to the basic rights of the individual."[6] The trial court's determination that Norwegian law would not enforce the forum selection clause against Mr. Valdez is supported by the record.
The Supreme Court in Lejano found that the forum selection clause was enforceable, and declined to make a determination of the applicable substantive law by applying the Lauritzen-Rhoditis choice-of-law test. Lejano, 97-0388 at p. 19, 705 So.2d at 169. Because we have determined that the forum selection clause was not enforceable against Mr. Valdez, we must decide if the trial court's application of the Jones Act and the general maritime law to this claim was proper pursuant to the Lauritzen-Rhoditis choice-of-law test.
The first U.S. Supreme Court case to address the issue of what law governs the liability of foreign shipowners vis a vis a foreign seaman asserting claims in American courts was Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). The key issue in Lauritzen, as stated by the Court, was whether the Jones Act of the United States should be applied to a maritime tort claim against a Danish owner by a Danish seaman who was injured on a Danish vessel while it was in Havana harbor. The seaman had signed ship's articles written in Danish (his native tongue) that provided that the rights of crewmembers were governed by Danish law and by the employer's contract with the Danish Seaman's Union. The Court noted that "Denmark has enacted a comprehensive code to govern the relations of her shipowners to her seagoing labor which by its terms and intentions controls this claim." Id. at 575, 73 S.Ct. at 924. The shipowner, whose position was supported by the Danish government, asserted that the Danish law supplied the full measure of the shipowners' obligation and that maritime usage and international law as accepted by the United States excluded the application of the Jones Act (an incompatible statute). The plaintiff, who conceded that Danish law applied to his claim, argued, however, that the Jones Act provided an optional cumulative remedy.
It was within this context that the Court articulated seven factors that, alone or in combination, are generally conceded to influence the choice of law to govern a maritime tort claim: 1) the place of the wrongful act; 2) the law of the flag; 3) the allegiance or domicile of the injured party; 4) the allegiance of the defendant shipowner; 5) the place of contract; 6) the inaccessibility of the foreign forum; and 7) the law of the forum. The Lauritzen Court considered those factors with reference to the case before it and concluded that there was an overwhelming preponderance in favor of Danish law. The Court could find no justification for interpreting the Jones Act to intervene between foreigners and their own law because of acts on a foreign ship not in American waters. Id. at 592, 73 S.Ct. at 933.
In Hellenic Lines Limited v. Rhoditis, 398 U.S. 306, 308, 90 S.Ct. 1731, 26 L.Ed.2d 252, reh'g denied, 400 U.S. 856, 91 S.Ct. 23, 27 L.Ed.2d 94 (1970), a case involving suit by a Greek seaman against the Greek owner of a Greek flag vessel for injuries suffered while in a U.S. port, the Court refined the Lauritzen test, and added the shipowner's base of operation as another important factor. Pointing out that the Lauritzen test is not a mechanical one, the Court stated that the significance of one or more of the factors must be considered in light of the national interest served by the Jones Act.[7] The Court then distinguished Rhoditis from Lauritzen on the basis of the extent of the *1201 contacts of the parties and the litigation to the United States. Emphasizing that the vessel was not a casual visitor to this country, but rather one that earned income from cargo originating or terminating in the United States, the Court saw "no reason whatsoever to give the Jones Act a strained construction so that this alien owner, engaged in an extensive business operating in this country, may have an advantage over citizens engaged in the same business by allowing him to escape the obligations and responsibility of a Jones Act `employer.'" Id. at 310, 90 S.Ct. at 1734.
The Lauritzen/Rhoditis test was articulated as a means to resolve conflicts between competing laws by identifying and weighing the importance of contacts between states or governments whose competing laws are at issue. Based on the evidence in this record, it appears that the general maritime law of the United States is in accord with the maritime law of the Philippines. Former Justice Alampay and Professor Balane attested that:
The determination and interpretation of Philippine law by a United States Court would neither conflict with the interest of the Philippine government and the uniform application of its labor statutes, the general maritime law or the Philippine Civil Code nor in any way adversely affect the interest of Philippine courts or its administrative agencies. On the contrary, it would be in the interest of the Philippine government because of the precedential value of American law and jurisprudence and the role heretofore played by United States courts in assuming leadership in determining maritime law issues.
The courts of the Philippines frequently utilize American admiralty and maritime law jurisprudence for precedential value; for example, the doctrine of unseaworthiness as it is applied in Philippine courts in admiralty cases, has been shaped by American jurisprudence. Likewise, other maritime theories of liability are based upon American jurisprudence. (citations omitted.)[8]
In a supplemental joint affidavit, Justice Alampay and Professor Balane opined that the principles of Philippine admiralty law are virtually identical to those of the United States general maritime law. In fact, where there is some doubt about a rule or principle of Philippine admiralty law, the Philippine courts resolve the problem by relying upon the admiralty jurisprudence of nations such as the United States.[9] The experts noted that:
[c]omparing these doctrines of liability [the duty of a shipowner/employer to provide seaman with a reasonably safe place to work] under Philippine law with the corresponding doctrines found in United States maritime jurisprudence, it becomes clear that the duties imposed upon the shipowner/employer under either Philippine maritime law or United States maritime law are virtually identical.[10]
This statement of Philippine law was validated by Mr. Kilayko. The affidavits of defendants' experts on Philippine law did not refute this proposition. Because there is no conflict between Philippine and U.S. maritime law, there was no need to perform the Lauritzen/Rhoditis analysis vis-a-vis the application of Philippine law.
The trial court herein found that several of the Lauritzen-Rhoditis factors militated in favor of applying the Jones Act and the general maritime law of the United States to this claim. The court noted that Mr. Valdez was injured in international waters, but just off the coast of Florida, to which he was transported for treatment by a United States Coast Guard helicopter. Mr. Valdez signed shipping articles, which, under international law constitute his contract of employment with the master and the vessel,[11] in the United States. The court found *1202 that the evidence supported the conclusion that the NIS flag of the Vestri was a flag of convenience, and, therefore, did not mandate the application of Norwegian law.[12] The trial court, like the Supreme Court in Rhoditis, supra, was influenced by the significant contacts between the vessel on which Mr. Valdez was injured and the United States. The court found that the M/T Vestri earned 100% of its income from voyages that began or ended in United States ports from a charter with an American company, and that the Norwegian corporation that owned the vessel was reorganized and diversified in order to allow it to profit from the United States shipping market. As the court noted:
Once again, the evidence establishes that this vessel and the corporations managing its operation were created solely for the purpose of profiting from the vessel sailing to and from American ports pursuant to a contract with an American corporation. To not subject these Defendants to the obligations codified in the Jones Act and amplified in the general maritime law of this country is to afford them an advantage over their competitors which itself violates a sense of fair play and substantial justice.
Most important to the trial court's determination was the question of whether Mr. Valdez had a means of relief in any other forum. The affidavits of plaintiff's experts on Philippine law opined that claims in tort for personal injury or death of a seaman are not covered by the POEA contract, which applies to contractual claims involving the interpretation and implementation of the CBA. Cf. Hodge v. Ocean Quest Int'l, Ltd., 1992 WL 162609 (E.D.La.1992); Cuizon v. Kedma, Ltd., 1997 WL 37938 (S.D.N.Y.1997) Plaintiff's experts also noted that Philippine courts could not compel a non-resident defendant or witness to appear before it. Nor could the POEA or the Philippine civil trial courts enforce a judgment rendered against a non-resident defendant unless the action was in personam and the defendant has property in the Philippines.
Defendants' experts on Philippine law disagreed with that opinion, and opined that the Philippines offered an adequate forum for Mr. Valdez' claim. Based on the record evidence we cannot say that the trial court abused its discretion when it accepted the testimony of plaintiff's experts over that of defendants' experts.
Although the trial court did not specifically address the place of the wrongful act or the inaccessibility of the foreign forum, we note that Mr. Valdez was evacuated from the Vestri by Coast Guard helicopter and taken to a hospital in Florida, the closest place for him to receive emergency medical treatment. His initial injuries alone, although serious, would not have prevented his being repatriated to the Philippines. As a direct consequence of those injuries, however, he suffered the stroke that resulted in his residual brain damage. As a consequence he received all of his medical treatment and rehabilitation therapy in this country. All of the witnesses with regard to Mr. Valdez' condition, medical history, convalescence, and rehabilitation are in the United States.
*1203 For the above reasons we find that the trial court's determination that Mr. Valdez' claim would be governed by United States law was correct.

DAMAGES:
The district court determined that the defendants, who conceded that the failure of the engine room crane rendered the Vestri unseaworthy, were not negligent. It awarded awarded damages as follows:

General Damages $1,500,000.00
Loss of Past Wages 8,592.00
Loss of Future Wages 374,747.00
Future Medical Care 3,000,000.00
Past Found 2,235.00
Future Found 136,989.00

The judgment provided that the defendants were to pay all costs, including expert fees, plus judicial interest of $300,000 representing interest on 20% of the general damage award from the date of the accident, and judicial interest from the date of judgment until paid on the remainder of the damages awarded.
Defendants contend that the award of damages to Mr. Valdez was excessive and erroneous as a matter of law. They have alleged three errors by the trial court in support of this contention: first, the court erred in making an award for future care or, alternatively, that the award for this element of damage was excessive because it was based on the cost of future care in the United States; second, that the award for general damages is excessive based on Mr. Valdez's injuries; and finally, that the district court erred in awarding found, or alternatively that this award is excessive.

FUTURE CARE:
Defendants argue that the trial court erred in making an award for future damages because such an award is not available under Philippine or Norwegian law. However, based on our analysis of the Lauritzen/Rhoditis factors, we found that the trial court's decision to apply United States law to Mr. Valdez' claim was correct.
Alternatively, the defendants contend that the award of $3,000,000 is excessive, even if such damages are available, because it is based on the cost of future care in the United States. Defendants argue that Mr. Valdez was required to establish that he was entitled to receive his medical care in the United States, and that he failed to do so. Although Carlos Valdez has been treated in this country since he was flown here for medical treatment in May of 1993, the defendants argue that he has not established that he cannot adequately be cared for in the Philippines.
The trial court's reasons for judgment demonstrate that it carefully considered the question of what type of care Mr. Valdez would require for the rest of his life, whether that treatment could be provided on an out-patient basis, and whether it would be available to him in the Philippines. The court's reasons included a lengthy summary of the testimony of the various experts and care givers who have treated and evaluated Mr. Valdez, including the defendants' evidence and arguments in support of its argument that he should be repatriated and cared for in the Philippines.
The defendants had argued that much of Mr. Valdez' cognitive deficiencies were caused by a language barrier, which would be obviated by a return to his homeland. The court rejected this argument finding that:
Language is not an issue. The plaintiff has established that he was taught and spoke English throughout his fourteen years of school and his deficits are not language based. That fact and the other evidence indicate that Valdez's deficits are, instead, directly related to the injuries resulting from his accident.[13]
This finding is fully supported by the record, and will not be disturbed on appeal.
In considering the question of whether Mr. Valdez could and would receive the necessary care in the Philippines, the court noted the great discrepancy between the evaluation of his abilities by his treating physician and care givers and that of the defendants' experts, who had seen him for purposes of litigation. The court found that the evidence established that Mr. Valdez presently was "receiving exemplary medical care of a type which is essential to his well being. While the defendants have sought to establish the adequacy of medical care in the Philippines, there is no evidence that he will even receive such care if relocated."[14]
*1204 Dr. Lune-Reyes, the defendants' expert who testified on the availability and quality of rehabilitation facilities in the Philippines admitted that there are no long-term residential care facilities in the Philippines for brain-injured patients. Although Dr. Reyes opined that the care Mr. Valdez needs would be available on an out-patient basis, under her supervision, in the Philippines, she admitted that her facility focused primarily on physical rehabilitation rather than treatment of brain injury. Dr. Reyes confirmed the cultural tradition in the Philippines by which people preferred to treat family members at home rather than in facilities. Although Dr. Reyes admitted that she knew nothing about the Valdez home, she opined that he would be better cared for by his own family than in the United States.
Plaintiff's experts who considered the issue of home-care in the Philippines, did know about Mr. Valdez' home. Dr. Alcazaren testified that it had no electricity, sanitation, running water or telephone. He concluded that it would not be an appropriate setting for Mr. Valdez to receive the care he needed. Furthermore, he opined that, even if a new home were built for him, the type of home care that could be provided in the Philippines would not be compatible with the care he was receiving the United States.
The court concluded that the evidence established that:
[T]here is a serious question as to the adequacy of the care available to Valdez in the Philippines both in terms of the type of care available and whether Valdez would even receive what may be available. There is no question that there is no type of long-term residential facility available to Valdez in the Philippines. Assuming Valdez may be adequately cared for on an out-patient basis, the evidence leaves the Court with a grave doubt that it would be administered properly.[15]
The determination of whether to calculate an award for future care on the rate of such care in the United States or in a foreign plaintiff's home country is a finding of fact that will vary from case to case. Hernandez v. MIV Rajaan, 841 F.2d 582 (5th Cir.), opinion corrected on denial of reh'g, 848 F.2d 498 (5th Cir.1988), cert. denied, Dianella Shipping Corp. v. Hernandez, 488 U.S. 981, 109 S.Ct. 530, 102 L.Ed.2d 562 and Hernandez v. Dianella Shipping Corp., 488 U.S. 1030, 109 S.Ct. 837, 102 L.Ed.2d 970 (1989). The record evidence supports this conclusion. We, therefore, cannot say that the court was manifestly erroneous when it concluded that the costs associated with Mr. Valdez' future care should be based on the cost of such care in the United States. Cf. Sosa v. MIV Lago Izabal, 736 F.2d 1028, 1034 (5th Cir.1984) (award of future care based on American standards correct where district court found that plaintiff would not receive adequate care in his home country.)
Although the court acknowledged that Mr. Valdez had received considerable benefit from the care and environment at the Living Center, and agreed that his spending the rest of his life there could be characterized as an "ideal situation," the evidence did not mandate that the defendants should pay for this level of care. Instead the court determined that:
[T]he cost of future care based on the testimony of the various witnesses as to the need for and the cost of a home where a team of professionals are available to constantly monitor the Plaintiff on a daily basis. Because of the Plaintiff's condition, as described by the various witnesses but also as observed by the Court during his testimony, the only way that Valdez can live outside of a residental facility is if he is cared for around-the-clock. The cost of his care must necessarily include twenty-four hour nursing care.[16]
The court was satisfied by the evidence presented and his own observation of Mr. Valdez that he would never be able to live on his own, and awarded $3,000,000 for future medical care associated with the cost of home care in the United States.
The trial court was presented with two options for the cost of future care for Mr. Valdez. Plaintiff offered evidence that the cost of maintaining him in his current situation at the Living Center was $6,300,000.
*1205 The defendants offered Dr. Burke's testimony that the cost of providing board and care management would be $2,400.00 per month or $28,800 per year. To that the court added $17,200 per year for the cost of nursing care and therapists that would be need to adequately care for Mr. Valdez and prevent his regressing and becoming depressed or suicidal, which was a genuine concern if he did not receive continued therapy. Dr. Randy Rice, plaintiff's expert economist projected the present value of future medical care based on $46,000 per year to be $2,134,400. However, the court found that the evidence did not support the proposition that the costs of therapy and round-the-clock nursing care could be provided for $17,200 per year. It, therefore, awarded $3,000,000, a figure that was between the cost for residental care at the Living Center and the cost of home care.
This court has recognized that the calculation of an award of future medical expenses need not be established with mathematical certainty. However, they must be established with some degree of certainty, and it must be shown that the expenses more probably than not will be incurred. See Cooper v. Liberty Mutual Ins. Co., 96-1522, p. 11 (La.App. 4 Cir. 8/20/97), 699 So.2d 115, 120, 121. We find, therefore, that the award of $3,000,000 for future medical care for Mr. Valdez, who was 25 years of age at the time of trial, is reasonable based on this record.[17]Cf. Sharkey v. Sterling Drug, Inc., 600 So.2d 701 (La.App. 1 Cir.), writs denied, 605 So.2d 1099, 605 So.2d 1100 (1992).

GENERAL DAMAGES:
The defendants argue that the award of $1,500,000 in general damages is excessive based on Mr. Valdez' injury and the fact that he can now:
set his alarm clock and awake himself; groom and dress; prepare breakfast; walk at least one mile per day; lift weights independently; swim; perform lawn maintenance at least two hours per day including mowing and edging; make purchases; play board games; use a computer; select, watch and enjoy movies; go bowling; and otherwise initiate activities.
The discretion vested in the trier of fact is great, and an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993); Coco v. Winston Indus., Inc., 341 So.2d 332 (La.1977).
The defendants argue that because Mr. Valdez' residual abilities are greater and his residual disabilities less than plaintiffs who have recovered less than the amount awarded to him, the general damage award should be reduced substantially. However, it is only after an articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review be considered either excessive or insufficient. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993), citing Reck v. Stevens, 373 So.2d 498, 501 (La.1979).
In considering the question of an appropriate general damage award to Mr. Valdez the court recognized the devastating effect of the mental injuries on this young man as well as his very serious physical injuries. On May 26, 1993, a crane in the engine room of the Vestri broke and dropped a large piston rod on Mr. Valdez, fracturing both of his legs. He was air-lifted to a hospital in Florida, where he underwent a closed reduction of the fracture of his right leg and surgery to place traction pins in his left leg. The following day he became confused, and then comatose; he was intubated in and placed on a ventilator. It was determined that, as a result of his orthopedic injuries, a fatty clot lodged in his brain. He was in a coma for approximately a month, during which time he began slow neurologic improvement. He was transferred to a rehabilitation facility where he underwent acute rehabilitation for nine weeks. He then went to a community re-entry center where he continued his therapy. He was then placed with the Cardenas family in Miami for approximately ten months. Mrs. Cardenas described him as being like a baby "helpless and just staring into space all of the time" when he first came to her. She eventually was able to teach him to do chores around *1206 the house, and helped him to establish a steady routine. Despite Mr. Valdez' significant improvement during the time he was in her home, Mrs. Cardenas felt that he could not be left alone. He was transferred from the Cardenas home to the Living Center in New Orleans. There he received therapy geared toward improving his ability to interact with people and process information. Consequently, he now is able to care for many of his own needs, albeit in a structured and supervised setting.
The experts disagree as to the impact of Mr. Valdez' cognitive deficit. Dr. Burke, defendants' expert in brain injury rehabilitation, opined that Mr. Valdez' physical functions, gross attention, language skills, social skills, pragmatic skills, and short-term memory were all within normal limits. Although Dr. Burke believes that Mr. Valdez requires some assistance with higher cognitive skills, and recognizes that he will require continued structure and supervision, he thinks that he can improve and become independent.
Plaintiff's experts believe that Mr. Valdez is incapable of taking care of himself outside of a structured environment. They seem to agree that he has reached a plateau, and he will not improve significantly. Instead, they opine that he needs continued therapy in order to prevent his regressing. Dr. Euginio Alcazaren, an expert in psychiatry with a particular expertise in physical medicine and rehabilitation, explained that Mr. Valdez is at risk to degenerate if he does not receive continued therapy. He opined that Mr. Valdez might vegetate and lose all functional ability. Dr. Michael Howard, an expert in counseling psychology, reviewed Mr. Valdez' medical records and performed a battery of tests in order to determine if he had cognitive and emotional deficits. He concluded that Mr. Valdez suffered a significant functional impairment; his intelligence quotient was in the mental retardation range and he functioned at the level of a child age ten or eleven. Dr. Howard compared Mr. Valdez to a ten year old latch-key child, who could look after himself for short periods of time, but who could not live on his own.
The tragedy of Mr. Valdez' situation is that, although he has diminished cognitive abilities, his long term memory is intact so that he remembers what he was capable of doing before his injury. In other words, he has retained enough to know just how much he has lost. Dr. Maaba, an expert in forensic psychiatry, testified that Mr. Valdez suffers from low self-esteem as a result of his inability to be productive.
It appears that Mr. Valdez has received excellent care, and has made remarkable strides. However, the evidence establishes that before this accident he was a young man, with a future. Although the parties disagree as to the extent of his impairment as well as whether he may yet improve, there seems to be no dispute that Mr. Valdez's future is quite limited as a result of his injury and its sequelae.
In addition to his mental injuries, both of Mr. Valdez' legs were broken, and he underwent several surgeries. These surgeries have caused severe scarring. One leg is now shorter than the other causing permanent functional impairment. The court noted that it had "observed that what was apparently an energetic, intelligent and ambitious young man is now a dull, slow and almost pathetic invalid." The record supports this assessment. Mr. Valdez is now twenty-seven; he will live with the residual effects of the unseaworthiness of the Vestri for many years. His loss is significant, and we cannot say that the court's award of $1,500,000 in general damages, based on the record evidence, is an abuse of its discretion. The general damage award, therefore, is affirmed.

FOUND:
Defendants argue that the award of past found of $12,235 should be reversed and the award of $136,989.00 for future found should be reduced to an amount not to exceed $15,000. As the trial court noted, found is the value of a seaman's living expenses aboard ship. This would include food, lodging and the value of other items provided to him by his employer aboard ship. Although we agree that Mr. Valdez has lost the found that his employer provided to him, we find that this loss has been included within the award for future medical care in this case. Therefore, the award of future found would constitute a double recovery to Mr. Valdez, and is not allowed. See, e.g., Crane v. Exxon *1207 Corp., U.S.A., 613 So.2d 214, 226 (La.App. 1 Cir.1993); Reed v. Seacoast Products, Inc., 458 So.2d 971, 977 (La.App. 3 Cir.1984).
Likewise, we find that the defendants' obligation for past found has been satisfied by its payment of maintenance. Plaintiff argues that a shipowner's obligation to provide found and its obligation to pay maintenance are separate and distinguishable. While found and maintenance may be separate benefits, they both compensate the seaman because he will no longer be living aboard ship. Although plaintiff contends that maintenance is the cost of maintaining the seaman ashore, it has not established that the maintenance rate paid to Mr. Valdez was less than the value of found.
For these reasons, the awards for past and future found are reversed.

CONCLUSION
The forum selection provision of the overseas employment contract signed by Mr. Valdez is not enforceable as to him, and the trial court was correct in applying United States law to his claim based on the Lauritzen/Rhoditis factors. The award of $3,000,000 for the cost of future medical care for Mr. Valdez is affirmed, as is the award of $1,500,000 for general damages, both of which are supported by the record. However, the awards of $12,235 and $136,989 for past and future found, respectively, constitute a double recovery, and are reversed. Each party is to bear its own costs.
AFFIRMED IN PART; REVERSED IN PART.
SCHOTT, C.J., dissents for the reasons assigned by KLEES, J., and for the following reasons.
SCHOTT, Chief Judge, dissenting.
A significant portion of the majority opinion is devoted to a discussion of the opinions of the experts on the enforceability of the forum selection clause. After discussing these opinions and recognizing the conflicts among them the majority properly defers to the trial court's resolution of these conflicts. However, the opinions of the plaintiff's experts do not support the judgment of the trial court. These experts simply stated that a forum selection law would not be enforced in the Philippines or in Norway. This is not the issue. We are concerned with whether the clause is enforceable in Louisiana. Our Supreme Court says it is absent special circumstances which the plaintiff did not prove to exist in this case. There is nothing in the opinion of plaintiff's experts to suggest that he cannot pursue a claim in the Philippines or Norway if his case in Louisiana is dismissed. Since he can do so, there is nothing unreasonable or unjust about enforcing the clause and dismissing his case.
KLEES, Judge, dissenting.
Because I find that the contractual forum selection clause entered into by plaintiff in this case is valid, enforceable and precluded plaintiff's suit in the lower court, I must dissent from the majority opinion. In rendering judgment in this case in favor of plaintiff, I believe that the trial court erred in two ways. First, I find that the trial court erred in resolving the choice of law issue and in applying United States law. Secondly, I believe the trial court erred in its application of United States law with respect to the enforceability of the contractual forum selection clause in view of the line of Louisiana jurisprudence leading up to the recent Supreme Court decision in Lejano v. Bandak, 97-0388 (La.12/12/97), 705 So.2d 158.

Choice of Law
As accurately stated by the majority, the Lauritzen-Rhoditis factors are intended to answer the choice of law question, i.e. should the court apply the law of the United States or the law of another nation. Of the eight non-exhaustive factors set forth in those cases, the trial court stated that the most important factor to the court's determination of the applicable law is the issue of whether Mr. Valdez has a means of relief in any other forum. The trial court resolved this issue in the negative, and the majority opinion finds no error in the trial court's determination that the Philippines does not offer an adequate forum for Mr. Valdez' claim. I disagree.
On the question of choice of law, this Court has affirmed a summary judgment dismissing a personal injury suit by a Filipino seaman against a foreign vessel owner filed *1208 in the Civil District Court for the Parish of Orleans, finding that Philippine law, not United States law, governed the action by virtue of a forum selection clause in an employment contract, virtually identical to the clause at issue in this case. Prado v. Sloman Neptun Schiffahrts-A.G., 558 So.2d 712 (La. App. 4 Cir.1990); reversed and remanded on procedural grounds, 565 So.2d 930 (La.1990); 611 So.2d 691 (La.App. 4 Cir.1992); writ not considered, 613 So.2d 986 (La.1993).
Further, in Barcelona v. Sea Victory Maritime, Inc., 619 So.2d 741 (La.App. 4 Cir. 1993), this Court followed the Prado decision in its interpretation of employment contracts drafted and regulated by the Philippine government. The Court in Barcelona affirmed the trial court's summary judgment in favor of defendants dismissing the claims of twelve Filipino seaman and the parents of a seaman who was killed in the course and scope of his employment. This Court found that Prado required an application of Philippine law as the choice of law, and succinctly stated as follows:
Louisiana has no interest in resolving disputes between Philippine citizens and foreign corporations arising from contracts drafted, regulated and approved by the Philippine Overseas Employment Administration and signed in the Philippines on a death claim from an accident which occurred in Europe. Rather, the Philippine government has a substantial public interest in providing these seamen with a fair hearing and just resolution of their claims.
The Court in Barcelona also rejected plaintiffs' claims which were similar to those raised in the present case and relied on by the trial court that the Philippines offered an inadequate and incompetent forum for the resolution of plaintiffs' claims.
After examining all of the Lauritzen-Rhoditis factors, as well as the decisions of Prado and Barcelona which I find to be controlling to the facts of the present case, I conclude that the trial court erred in applying United States law to the present lawsuit involving a claim brought by a Filipino seaman against a foreign shipowner. I believe that plaintiff's claim is governed by Philippine law, and I would vacate the trial court's judgment on this basis.

Forum Selection Clause
Even assuming the trial court was correct in choosing United States law as the applicable law, I believe that the clear terms of the forum selection clause entered into by plaintiff requires dismissal of plaintiff's suit in state court.
Plaintiff executed the standard POEA individual employment contract, which was exactly the same form as the contract executed by the plaintiffs in the cases of Prado and Barcelona. In both of those cases, the courts enforced the forum selection clauses. Further, as stated by the majority, the Louisiana Supreme Court rendered a decision following the trial of the present matter which directly controls the application of the forum selection clause in this case. In Lejano v. Bandak, 97-0388 (La.12/12/97), 705 So.2d 158, the Supreme Court held that forum selection clause should be enforced absent a clear showing that enforcement would be unreasonable or unjust, and that the clause is invalid for such reasons as fraud or overreaching. Although the plaintiff in Lejano maintained that he had no power to negotiate the terms of the agreement he entered into with his employer because the contract was written in English, the Supreme Court held that the forum selection clause was enforceable as it had been approved by the Philippine government and it had been signed by Mr. Lejano, and was presumed to be the intent of the parties. Further, the Supreme Court's decision in Lejano has been followed recently by a panel of this court in Sanchez v. Commodore Cruise Lines, Ltd., et al, 97-2355 (La.App. 4 Cir.4/22/98), 1998 WL 256691, 713 So.2d 572.
The majority opinion distinguishes Lejano because the plaintiff in this case was not a veteran seaman and was not a member of the Philippine union that was a member of the collective bargaining agreement which led to the drafting of the employment contract. Further, the majority opinion agrees with the trial court's determination that neither the law of Norway or the law of the Philippines would enforce the forum selection clause under the facts of this case.
However, I fail to find these facts to materially distinguish this case from the facts *1209 presented in Lejano. Rather, I find that Louisiana courts have consistently upheld the enforceability of forum selection clauses such as the one here, absent evidence of fraud, undue influence or overreaching.
In the present case, Mr. Valdez signed the employment contract which plainly included the forum selection clause requiring him to bring all actions against the shipowner in Norway or the Philippines. The employment contract was approved by the POEA, and regardless of whether Mr. Valdez was a member of the union which participated in the collective bargaining agreement which gave rise to the terms of the contract, Mr. Valdez obviously benefits from the contract. The fact that Mr. Valdez was not a veteran seaman or a member of AMOSUP does not in itself indicate that the contract was "affected by fraud, undue influence, or overweening bargaining power," as was the test for enforceability in Lejano. Further, as in Lejano, the employment contract drafted and approved by the POEA would certainly be enforceable in the Philippines, and I do not find that plaintiff has no available forum in that country.
In the present case, I find that Mr. Valdez failed to make a clear showing that enforcement of the forum selection clause in the employment contract would be unreasonable, unjust, fraudulent or overreaching such to render it unenforceable. Based on the standards set forth by the Supreme Court in Lejano which I find to be applicable herein, I find that the forum selection provisions of Mr. Valdez' employment contract are enforceable under the laws of the United States. I would therefore vacate the judgment of the trial court and remand the case to the trial court to allow plaintiff to file his suit against the shipowner in the Philippines or Norway, as stated in the employment contract.
NOTES
[1] Nestor Abuan, who brought this suit on behalf of Carlos Valdez, is Mr. Valdez' curator by virtue of guardianship proceedings in Florida.
[2] The seized vessel was released upon the defendants providing a "Letter of Undertaking" in the amount of $10,000,000, guaranteeing payment of any judgment rendered against them in favor of Mr. Valdez.
[3] Abuan v. Smedvig Tankships, Ltd., 95-0629 (La. App. 4 Cir. 7/28/95).
[4] Because of the procedural history of the case, plaintiff also argued that the "law of the case" doctrine precluded dismissal of his claim based on the forum selection clause. That argument is not relevant to this appeal.
[5] Mr. Valdez has requested that this court take judicial notice of the Migrant Workers Act, Philippine Republic Act No. 8082 dated June 7, 1995, which vests exclusive jurisdiction of claims by a seaman for wages, overtime or separation pay in the National Seaman's Board, rather than the POEA, as provided in the overseas employment contract at issue herein.
[6] Joint Exhibit # 14, p. 3.
[7] The Louisiana Supreme Court also has recognized that the Lauritzen/Rhoditis test is not applied mechanically. In Powell v. McDermott International, Inc., 588 So.2d 84 (La.1991), a case involving an American seaman injured off the coast of Africa, the Court noted that not all of the factors are of equal weight. See also, Beasley v. McDermott Int'l, Inc., 94-1352 (La.6/24/94), 640 So.2d 1326.
[8] Joint Exhibit # 15, p. 11.
[9] Joint Exhibit # 67, p. 2-3.
[10] Joint Exhibit # 67, p. 8.
[11] See, Thomas J. Schoenbaum, Admiralty and Maritime Law, 242 (2d ed.1994); 1 Martin J. Norris, The Law of Seamen § 6.1 (4th ed. 1985 & 1996 Supp.); Jose v. M/V Fir Grove, 801 F.Supp. 358, 371 (D.Or.1992).

Plaintiff contends that the shipping articles that Mr. Valdez executed did not contain a forum selection clause. The defendants have not produced the articles Mr. Valdez signed.
[12] The record establishes that the M/T Vestri was sold to Smedvig Tankers Limited on May 21, 1993. Joint Exhibit #36. The evidence includes a Bill of Sale executed May 26, 1993, the day of this accident, transferring all shares of K.S. Smedvig Tankers V in the M/T Vestri to Vestri Shipping, Inc., a Liberian corporation. The affidavit of Emanuel N. Gbalazeh, Former Chief Justice of the Liberian Supreme Court, stated that Liberia adopts and incorporates the general maritime law of the United States to the extent that it does not conflict with any of the provisions of Title 22 of the Liberian Code of Laws. Justice Gbalazeh opined that the application of U.S. law to the claim for an injured seaman would create no such conflict. Joint Exhibit # 37. Exhibits offered by defendants show the effective date of the transfer as May 29, 1993, the date upon which the transfer was registered. Joint Exhibit # 39.

The experts in Norwegian law disagree as to whether Norway recognizes a cause of action for strict liability against a vessel owner. Defendants' expert opined that strict liability of a vessel owner is recognized only with regard to pollution damage, and that there is no cause of action for unseaworthiness. Joint Exhibit # 6. Plaintiff's expert disagreed and stated that the strict liability of a shipowner has been recognized in situtations where injury is due to the failure, weakness or imperfection of a vessel's technical equipment. Joint exhibit # 14.
[13] Reasons for Judgment, p. 29.
[14] Reasons for Judgment, p. 30.
[15] Reasons for Judgment, p. 32.
[16] Reasons for Judgment, pp. 34-35.
[17] In fact, this award is consistent with the plaintiff's evidence of the cost of future care for Mr. Valdez in the Philippines.